NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11955

COMMONWEALTH  vs.  WILLIAM GODDARD.

Worcester.     October 11, 2016. - February 9, 2017.

Present:  Gants, C.J., Hines, Gaziano, Lowy, & Budd, JJ.

Homicide.  Evidence, Expert opinion.  Witness, Expert.
    Practice, Criminal, Capital case, Argument by prosecutor.

Indictments found and returned in the Superior Court
Department on June 5, 2008.

The cases were tried before Richard T. Tucker, J.

Robert S. Sinsheimer for the defendant.
Ellyn H. Lazar-Moore, Assistant District Attorney, for the
Commonwealth.

LOWY, J.  The jury convicted the defendant, William

Goddard, of murder in the first degree on the theory of

deliberate premeditation.[1]  On appeal, the defendant argues that

---

[1] The defendant also was convicted of aggravated kidnapping,
several counts of armed assault with intent to murder, several
counts of assault by means of a dangerous weapon, two counts of
assault and battery by means of a dangerous weapon, and various

(1) the trial judge erred by permitting the Commonwealth's expert witness to testify that the defendant had premeditated the killing, (2) the same expert was impermissibly permitted to state the basis of her opinion on direct examination, and (3) the prosecutor made statements not supported by evidence during closing arguments.  We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E.

1.  Background.  We summarize the facts the jury could have found and reserve other details for discussion of specific issues.  On the morning of January 28, 2008, the defendant shot and killed his former girl friend (victim).  The victim and the defendant met in October, 2005, developed a romantic relationship, and began living together.  By August, 2007, their relationship began to deteriorate, partly because the defendant suspected the victim was having an affair with her boss.  In October, 2007, the relationship between the victim and the defendant ended when she kicked him out of the house.  The defendant did not take the break up well.

On the morning of the murder, the defendant arrived in his automobile at the automotive shop where the victim worked.  The defendant forced an employee at gunpoint to bring him to the office that the victim shared with her boss.

---

firearms charges.  The jury found the defendant not guilty of several counts of armed assault with intent to murder.

Upon entering the office, the defendant said to the victim, "[S]hut up.  Don't move.  Shut up.  Don't move."  The victim responded, "Bill, what are you doing?"  The defendant then shot the victim a single time in the neck, killing her in a matter of minutes.  The defendant also shot the boss in the left arm; he lay on the ground to "play[] dead."  The defendant then attempted to fire the gun a third time, in an unspecified direction, but his weapon misfired.

Upon hearing the misfire, the employee who had taken the defendant to the office ran out of the room.  The defendant fired several more times in his direction and in the direction of three other employees, who were hiding behind a forklift outside the office.  The fleeing employee was able to get outside, but he slipped on a patch of ice and fell.  While he was on the ground, the defendant caught up to him and again tried to shoot him, but again, the defendant was unable to fire the gun.  The defendant told the man, "You better run."

The defendant then fled the scene in his vehicle.  Minutes later, a Webster police officer stopped the defendant for speeding in a construction zone less than one mile from the shop.  The defendant held the steering wheel and stared straight ahead while the officer reprimanded him, only saying, "Sorry, Officer."  Unaware of the shooting, the officer allowed the defendant to leave with a warning.

While in his vehicle, the defendant used his cellular telephone to call an agent with the Federal Bureau of Alcohol, Tobacco, and Firearms. The defendant had known the agent for over a year through her work. The defendant told her that he was currently driving around Webster and that, "I was at my ex-girlfriend['s] workplace. I confronted her. I think I shot her in the face, and I possibly have shot others, other employees." When the agent suggested he turn himself in, he said, "No, I'd rather kill myself," and hung up the telephone.

The defendant then drove to his sister's house in Spencer. Once there, he told his sister that his vehicle needed repair and convinced her to give him a ride to Worcester. The defendant's sister testified that on the way to Worcester her brother seemed normal, but later told her, "If we get pulled over, I hope you don't get shot." When she asked what he was talking about, he repeatedly said, "The less you know, the better."

The sister dropped him off in a restaurant parking lot in Worcester, where he had arranged for a female acquaintance to meet him. The defendant had told the acquaintance a similar story about his vehicle needing repair. She brought the defendant back to her house, where they both stayed for about ninety minutes. During that time, the acquaintance observed the defendant acting strangely. The acquaintance received a

telephone call from a friend, who informed her that the police were looking for her vehicle. The defendant, overhearing the conversation, ran out of the house.

The defendant sprinted to a nearby field, where he stood with his gun pointed at his head. A large police presence quickly arrived on scene. A State police negotiator talked with the defendant to try to prevent him from killing himself. The defendant was agitated and demanded that the police kill him. The defendant told the negotiator, "My side of the story is on a [compact disc] in my truck." The defendant was eventually convinced to accept a cup of coffee, and while he was bending over to pick it up, the police shot him with nonlethal ammunition and took him into custody.

The police obtained warrants and searched the defendant's apartment and vehicle. As the defendant had indicated, the search of his vehicle revealed a compact disc (CD) in a plastic sleeve. The CD contained an audio recording wherein the defendant made several statements about his intention to kill the victim and her boss. The search of the defendant's apartment uncovered his computer. A forensic examination of that computer revealed Internet searches that had occurred between December, 2007, and January, 2008, and that included phrases such as "How to kill someone," "Murder an ex-girlfriend," and "How to use a handgun to kill."

At trial, the defendant did not dispute that he killed the victim.  He presented a lack of criminal responsibility defense.  To support his defense, the defendant called Dr. Eric Brown, an expert clinical and forensic psychologist, as a witness.  Dr. Brown met with the defendant on several occasions after the killing.  He testified that the defendant suffered from bipolar disorder, posttraumatic stress disorder (PTSD), and possibly a seizure disorder.  As a result of those mental disorders, Dr. Brown testified that he believed that the defendant "was unable to control his behavior to conform with the law."  In rebuttal, the Commonwealth called Dr. Alison Fife, a psychiatric expert, as a witness.  She testified that the defendant did not suffer from bipolar disorder, PTSD, seizure disorder, or a mental disease at the time of the killing.  Further, she testified that the defendant had the substantial capacity to conform his conduct to the requirements of the law.[2]

2.  Discussion.  a.  Testimony on the ultimate issue of guilt.  The defendant argues the Commonwealth's expert witness, Dr. Fife, was improperly permitted to testify that the defendant premeditated the killing.  On direct examination, the prosecutor asked Dr. Fife the following question:  "Based on your review of the material, and specifically the investigation of the case and

_____

[2] The defendant did not claim that he lacked the substantial capacity to appreciate the criminality of his conduct.  See Commonwealth v. McHoul, 352 Mass. 544, 555 (1967).

the CD you mentioned, do you have an opinion as to whether or not on January 28th, [the defendant] engaged in goal-directed behaviors?" Over objection, Dr. Fife responded, "My opinion is that [the defendant's] behaviors on that day were planned."

There is no prohibition on an expert testifying to an opinion that touches the ultimate issue in a case. Commonwealth v. Canty, 466 Mass. 535, 543 (2013). See Mass. G. Evid. § 704 (2016). However, an expert opinion stating whether a defendant is guilty or innocent is not permitted. Commonwealth v. Hamilton, 459 Mass. 422, 439 (2011). The jury must be allowed to reach their own conclusion from the evidence; an opinion touching on guilt or innocence usurps the jury's function as the sole and exclusive finders of the facts. Where testimony approaches an ultimate issue of guilt, "the probative value of the opinion must be weighed against the danger of unfair prejudice." Canty, 466 Mass. at 544. See Mass. G. Evid. § 403 (2016).

Taken in context, Dr. Fife's opinion that the defendant's behavior was planned and goal-directed was relevant to the issue of criminal responsibility, not premeditation. Although the form of the question and the answer lacked precision, it was an appropriate subject for expert testimony. See Commonwealth v. Boateng, 438 Mass. 498, 508 (2003) (permissible for expert to

discuss defendant's "goal-directed actions" in opinion on defendant's criminal responsibility).

Even if Dr. Fife's statement that the defendant's behavior on January 28 was "planned" was error due to the form of the question or because it was inadmissible on the issue of premeditation,[3] it caused no prejudice to the defendant. The evidence of the premeditation of the killing was overwhelming: the defendant searched the Internet using such highly incriminating phrases as "How do I get away with murder"; arrived at the victim's workplace with a gun and additional ammunition; and forced an employee at gunpoint to take him to the victim's office. Most damningly, the defendant said on the CD, i.e., "his side of the story," that "if you're listening to this recording, I accomplished what I set out to do," and "I gave up living. And, you know, and I decide to say, 'You know what? If I'm not living, she's not living either.' I decide to kill her, you know, and I decide to kill her boy friend."

The defense's own expert also acknowledged that the defendant's actions on January 28 were "goal-directed." In response to the question, "Now, it's fair to say, isn't it, that all of the [defendant's] behaviors . . . on [January 28] . . . were purposeful, goal-directed behaviors, weren't they?" Dr.

---

[3] The defendant did not request an instruction limiting the purpose for which the jury could consider Dr. Fife's testimony to the issue of criminal responsibility.

Brown responded, "I would say so, yes."  Finally, the trial

judge properly instructed the jury that expert opinions were to

be evaluated by the jury, who were free to accept or reject the

opinion.  Commonwealth v. Cyr, 425 Mass. 89, 97 (1997), S.C.,

433 Mass. 617 (2001).  See Commonwealth v. Hinds, 450 Mass. 1,

14-15 (2007), S.C., 457 Mass. 83 (2010).

   b.  Bases for Dr. Fife's opinion.  The defendant also

contends the trial judge erroneously permitted Dr. Fife to state

the bases of her opinion on direct examination.  Dr. Fife

explained that her opinion was supported by "things that had

been talked about [at trial] and that I gleaned from the records

and my evaluation about shooting at people in the building,

fleeing the scene, making the [tele]phone calls, being stopped

by the police officer, going to the friend's house, [and]

fleeing when he knew someone was after him."  She also said her

opinion was based on "my understanding of the evidence, meeting

with [the defendant] and knowing everything I do about this

case."

   Experts "may base their opinions on (1) facts personally

observed; (2) evidence already in the records or which the

parties represent will be admitted during the course of the

proceedings, assumed to be true in questions put to the expert

witnesses; and (3) 'facts or data not in evidence if the facts

or data are independently admissible and are a permissible basis

for an expert to consider in formulating an opinion.'" Commonwealth v. Markvart, 437 Mass. 331, 337 (2002), quoting Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986). See Mass. G. Evid. § 703 (2016). In regard to the third category, experts are prohibited "during [their] direct examination[s] from informing the jury about the facts or data [they] considered that were not in evidence but that would be admissible with the right witness or proper foundation." Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010), cert. denied, 563 U.S. 990 (2011). See Mass. G. Evid. § 705 (2016). Where an expert is basing an opinion on information independently admissible but not admitted in evidence, "[t]he thrust of [our] rule is to leave inquiry regarding the basis of expert testimony to cross-examination . . . ." Department of Youth Servs., supra at 532, quoting Advisory Committee's Note on Proposed Mass. R. Evid. § 705.

This last limitation on inquiry regarding the basis of an expert's opinion to cross-examination prevents "the danger that the [proponent of the expert opinion] would use an expert's opinion to inform the jury of facts not in evidence." Barbosa, 457 Mass. at 785. In short, allowing testimony regarding the basis of the opinion on direct examination, in this context, would import inadmissible hearsay into the trial. However, where facts or data are already admitted in evidence, we have

held that it is "permissible for the expert witnesses to reference that evidence in their own expert testimony." McHoul, petitioner, 445 Mass. 143, 146 (2005), cert. denied, 547 U.S. 1114 (2006).

With one exception, the facts Dr. Fife referenced in her testimony already had been admitted in evidence.[4] Several other witnesses had testified to the defendant's conduct on January 28, and defense counsel had already elicited much of the same information during the examination of Dr. Brown. Accordingly, Dr. Fife's direct examination was not used to put facts not properly in evidence before the jury, beyond the one minor exception. See Markvart, 437 Mass. at 338. See also note 4, supra.

c. Closing argument. The defendant also argues that the prosecutor was improperly permitted to argue facts not in evidence during closing argument. During closing argument, the prosecutor referenced the CD made by the defendant: "[A]lthough

---

[4] The one exception was Dr. Fife's testimony that the defendant had previously done "things like turning on the Bunsen burners in middle school." This incident was not in evidence, and should not have been stated on direct examination as a basis for Dr. Fife's expert opinion. The defendant objected to this statement at trial, but he did not argue it on appeal. Nevertheless, the reference was fleeting, and the incident relatively innocuous and remote in time. See Commonwealth v. Appleby, 389 Mass. 359, 375 (1983), cert. denied, 464 U.S. 941 (1983). We are confident that there was no reasonable possibility that the admission of this portion of Dr. Fife's testimony contributed to the jury's verdict. See Commonwealth v. Alphas, 430 Mass. 8, 23 (1999) (Greaney, J., concurring).

we don't know exactly when [the CD] was [made], . . . you would be warranted in concluding that it . . . was made very close in time to the killing itself."  The prosecutor further remarked, "[T]he CD may well have been the last step, because we know from [the defendant's] words it was made in January."  After the conclusion of the closing argument, the defendant objected at sidebar to the prosecutor's statements that the CD had been made during January, 2008.  The trial judge declined to give a curative instruction, but did instruct the jury generally that statements made by the prosecutor were not evidence.

A prosecutor may not misstate evidence or refer to facts not in evidence in a closing argument.  Commonwealth v. Walters, 472 Mass. 680, 703 (2015).  "A prosecutor may, however, in closing argument, analyze the evidence and suggest what reasonable inferences the jury should draw from that evidence."  Commonwealth v. Grimshaw, 412 Mass. 505, 509 (1992).  The inference "need not be necessary and inescapable, only reasonable and possible."  Commonwealth v. Jones, 432 Mass. 623, 628 (2000).  Statements made by a prosecutor in closing must be viewed in light of the entire argument, the judge's instruction to the jury, and the evidence at trial.  Commonwealth v. Coren, 437 Mass. 723, 730-731 (2002).

There was no conclusive proof as to the date the CD was made.  The defendant's expert, Dr. Brown, testified that the

defendant told him he made the CD on December 15, 2007. The Commonwealth argued that the CD had instead been made during January, 2008. The defendant's statement on the CD, which was played for the jury, included the following: "But, you know, I mean, October of <u>last year</u> came and she was very distant from me, starting fights with me, leaving. Then all of a sudden I was thrown out for supposedly treating her son mean. You know, I thought it was just another fight but she never asked me to come home again." (Emphasis added.) Dr. Brown testified that the defendant and the victim had stopped living together in October, 2007. The Commonwealth argued that the "last year" statement was referring to the October, 2007, incident, and therefore the CD had to have been made in 2008. When asked on cross-examination if the "last year" reference suggested that the CD had been made in 2008, Dr. Brown replied, "possibly."

The prosecutor's statement that the CD was made in January, 2008, was a reasonable inference. There was no error.

d. <u>Review pursuant to G. L. c. 287, § 33E</u>. We have reviewed the entire record on both the law and the facts pursuant to our obligation under G. L. c. 278, § 33E. We conclude that the defendant is not entitled to relief, as the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial.

<u>Judgment affirmed</u>.