NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11802

COMMONWEALTH  vs.  CHRISTOPHER PIANTEDOSI.


Middlesex.     October 6, 2017. - December 18, 2017.

Present: Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide. Mental Impairment. Intoxication. Insanity.
    Evidence, Intoxication, Insanity, Expert opinion. Witness,
    Expert. Constitutional Law, Fair trial. Due Process of
    Law, Fair trial. Fair Trial. Practice, Criminal, Capital
    case, Fair trial, Instructions to jury, Acquittal by reason
    of insanity.



    Indictments found and returned in the Superior Court
Department on June 7, 2012.

    The cases were tried before Diane M. Kottmyer, J.


    Robert S. Sinsheimer (Lisa A. Parlagreco also present) for
the defendant.
    Emily K. Walsh, Assistant District Attorney (Nicole L.
Allain, Assistant District Attorney, also present) for the
Commonwealth.


    GAZIANO, J.  A jury in the Superior Court found the

defendant guilty of murder in the first degree in the stabbing

death of his longtime girl friend, on theories of deliberate

premeditation and extreme atrocity or cruelty.[1]  At trial, the

defendant conceded that he had killed the victim but asserted

that he lacked criminal responsibility for her death due to his

involuntary intoxication from having taken prescribed

antidepressant medications.  In this direct appeal from his

convictions, the defendant challenges the judge's refusal to

permit a defense expert to testify on direct examination to

hearsay statements made by the defendant; the introduction of

testimony by the Commonwealth's expert concerning what "drove"

the defendant's behavior; and the judge's failure to instruct

the jury that the consequences of a verdict of not guilty by

reason of insanity would include a potential psychiatric

commitment for life.  In addition, the defendant asks this court

to exercise its extraordinary authority under G. L. c. 278,

§ 33E, to reduce the verdict to murder in the second degree.

For the reasons that follow, we affirm the defendant's

convictions and, after a thorough review of the entire trial

record, decline to grant relief pursuant to G. L. c. 278, § 33E.

    1.  <u>Background</u>.  We summarize the facts that the jury could

have found, reserving other details for later discussion of

particular issues.

---

[1] The defendant also was convicted of malicious destruction
of the victim's personal property.  See G. L. c. 266, § 127.

a.  Commonwealth's case.  The victim and the defendant were involved in an eighteen-year relationship and had a daughter, Alexa,[2] who was a teenager at the time of these events.  The victim had a son from another relationship, whom she and the defendant were raising as their child.  The four lived as a family for approximately six years in an apartment in a three-family house then owned by the defendant's parents, and thereafter for more than ten years in a rented house in Burlington.  In April, 2012, the defendant moved into his parents' house, explaining that he needed time and space away from the victim.  The victim confided to a friend that she had asked the defendant to leave due to his verbal and emotional abuse.

In the early evening of May 3, 2012, the defendant went, as scheduled, to the house in Burlington to visit Alexa.  Alexa noticed that he was "kind of acting strange."  The defendant agreed to buy Alexa dinner, and the victim placed an order for takeout food delivery.  While the three were together in the living room, the defendant and the victim got into an argument.  At trial, Alexa was not certain of the topic of the disagreement, but recalled that the defendant "started saying something and she [was] getting mad.  So they were kind of like

_____

[2] A pseudonym.

fighting back and forth."  The defendant instructed Alexa to go to her room, and she did so.

At around 6:30 P.M., Alexa used a tablet computer, which she propped up on her window sill, to "video chat" with a friend, Ethan.[3]  Alexa and Ethan were able to see and hear each other using this computer program.  While they were talking, Alexa thought that she heard the doorbell or a knock on the door, and stepped out of her room believing that her takeout food delivery had arrived.  Ethan stayed connected to the video chat, waiting for Alexa to return.

Alexa's parents were in the kitchen, arguing.  The victim, who appeared distraught, picked up the telephone and threatened to call the police.  The defendant snatched the telephone from her.  He then removed a small knife from his pants pocket and put it down on a living room table.  The victim seized the knife, pointed it at the defendant, and implored him to leave the house.  She repeatedly said, "Get out.  I'll call the cops. You're scaring me."  As the victim cried, the defendant hugged Alexa and said, "I love you."  Alexa replied, "Are you trying to kill her or something?"

The defendant went into the kitchen and stood there, telling himself, aloud, that he was going to calm down.  He then turned abruptly, grabbed a butcher knife from a knife block on

_____

[3] Also a pseudonym.

the counter, and chased the victim. The victim ran into Alexa's room in full view of Ethan, who watched from his computer screen.

The victim was holding the bedroom door shut when the defendant broke down the door and burst into the room. The force knocked the victim backwards onto the bed. She screamed, "No, Chris, stop. I love you." Alexa entered the room shortly thereafter and attempted to pull the defendant away from the victim by grabbing him around the neck. The defendant pushed her off.

Through the video chat, Ethan watched the defendant shake the victim forcefully and then stab her in the chest while she was lying on the bed; Ethan screamed "Stop" into the computer microphone, but the defendant did not react. Alexa was still in the room; she told the defendant that she was calling the police, grabbed her cellular telephone, and ran from the room. Ethan heard the victim say, "Remember," and the defendant respond, "No, you got to die. You got to die." The defendant stabbed the victim repeatedly until she fell off the bed onto the floor.

Alexa ran out of the house, where she encountered the food delivery driver, who had just arrived. Alexa sat in the vehicle with the driver and telephoned 911. Alexa and the driver watched as the defendant walked away from the house toward his

vehicle.  The delivery driver described the defendant as "stone face[d]."  When police arrived, within minutes of Alexa's call, they found the victim's body on the floor in the space between the edge of Alexa's bed and the wall.  The victim had been stabbed more than thirty times and the kitchen knife was imbedded in her neck.

The defendant left Burlington and eventually drove to western Massachusetts.[4]  The next day, May 4, 2012, the defendant drove his automobile into the parking lot of the State police barracks in Weston.  He got out of his vehicle and lay on the ground.  A public works employee driving nearby and saw the defendant lying in front of his vehicle.  The employee tried to rouse him but was unable to do so; the defendant remained unresponsive.  The employee went into the barracks and summoned police officers to help.  One of the officers, who recognized the defendant from a police bulletin and media reports, placed him under arrest.  Investigators searched the defendant's vehicle and found handwritten notes on the dashboard.  One note read, "Unarmed.  Just have to sleep."  Another portion of a note recounted the stabbing.

---

[4] Burlington police tracked the defendant's cellular telephone to a location approximately thirty miles away, at a shopping mall in Leominster.  Police recovered the defendant's bloody clothing and his cellular telephone from a Dumpster behind the mall.

b.  Defendant's case.  After the Commonwealth rested its case-in-chief, the defendant presented evidence concerning the issue of his criminal responsibility on the day of the homicide. The defendant called two witnesses:  his father and Dr. Wade C. Meyers, a forensic psychiatrist.  The defendant also introduced medical records from his admissions to the Lahey Clinic and Holy Family Hospital, records relating to his psychiatric treatment at the county jail and Bridgewater State Hospital, and a May 7, 2012, competency evaluation.

The defendant's father provided background information about the defendant, including describing the defendant's "normal" relationship with the victim.  The father also testified to the defendant's psychiatric hospitalization a few days before the May 3, 2012, incident.  On April 29, 2012, the father visited the defendant at the Holy Family Hospital emergency room and observed that he was quiet and nontalkative. According to medical records, the defendant had been admitted to the hospital for self-inflicted injuries to his arms.  He was diagnosed with depression and prescribed Prozac (to be taken in the morning) and Trazodone (to be taken before bed).

Upon the defendant's discharge on May 2, 2012, his father picked him up from the hospital and drove him to a pharmacy to

fill his prescriptions.[5]  The defendant was scheduled to attend an outpatient program beginning on May 3, 2012.  He spent the afternoon in his room but left to attend classes at a professional school that evening; several of the students in his class noticed that he seemed tired and unwell.  The next morning, the defendant did not come downstairs from his bedroom until approximately 11:30 A.M.; he was pale and dehydrated.  The defendant left the house shortly thereafter, telling his father that he was planning to pick Alexa up at school, because she had a half-day off, and take her out for ice cream.

Meyers evaluated the defendant to determine his mental state at the time of the crime.  Based on interviews with the defendant, Meyers's review of past psychiatric records, neuropsychological testing, and other information, Meyers concluded that on May 3, 2012, the defendant did not have the capacity to appreciate the wrongfulness of his conduct and was not able to conform his conduct to the requirements of the law.  Meyers opined that the defendant suffered from involuntary intoxication from the antidepressants Prozac and Trazodone.  He explained that possible side effects of those medications included "irritability, rage reactions, hostility, mania,

---

[5] After the defendant's arrest, his father counted the Prozac and Trazodone pills remaining in the defendant's prescription bottles.  He testified that there was one pill missing from both bottles, which could have indicated that the defendant had taken his medications as prescribed.

insomnia, racing thoughts, a disinhibition of . . . behavior, impulsivity and trouble concentrating." Meyers opined further that the defendant suffered from bipolar disorder, and therefore that he was more vulnerable to the toxic effects of Prozac and Trazodone. He noted that Prozac and Trazodone contain warnings to screen for bipolar disorder because "taking those medications has a significant risk of swinging you into a manic episode." He stated that people with bipolar disorder who are treated with antidepressants generally are also treated with mood stabilizers to prevent possible manic episodes.

In rebuttal, the Commonwealth called Dr. Alison Fife, a forensic psychiatrist. Fife also had interviewed the defendant and reviewed the relevant treatment records and police reports. She disagreed with the conclusion that the defendant was intoxicated by therapeutic doses of Prozac and Trazodone. She also did not agree with Meyers's diagnosis of bipolar disorder. Fife testified that a mental disease or defect did not "drive" the defendant to kill the victim. When asked, in her opinion, what did "drive" the defendant to do so, she responded that feelings of anger, sadness, and rage "drove" the defendant's behavior.

2. Discussion. a. Limitations on direct examination of defendant's mental health expert. The defendant contends that he was precluded from presenting a complete defense because the

judge did not permit the introduction of certain testimony by the defendant's medical expert concerning a conversation that the expert had had with the defendant during the forensic interview.  The defendant argues that the exclusion of these statements violated his rights under the due process clause and the Sixth Amendment to the United States Constitution.  Because the defendant objected, we review to determine whether the exclusion of the evidence was error, and if so, whether it was prejudicial.  See Commonwealth v. Aviles, 461 Mass. 60, 67 (2011).

In conducting his evaluation of the defendant's mental state, Meyers reviewed the defendant's mental health records, police reports, and other discovery material; interviewed collateral witnesses; and "met with [the defendant] on two occasions:  May 2[, 2013,] and July 19[, 2013,] for a total of about seven and a half hours."  On direct examination, defense counsel asked Meyers about certain statements the defendant had made to him during the course of these interviews.  Counsel inquired, "Were you able to learn anything from [the defendant] concerning his mental health history. . . that was of significance to you in forming your opinion?"

The prosecutor objected to the question because the defendant's statements had not been admitted in evidence.  As an offer of proof, defense counsel represented that Meyers would

testify to statements made by the defendant "about experiencing manic-like symptoms in the past . . . hyperactivity, increased mood, . . . needing to sleep for a couple of days at a time, that sort of thing."  Counsel added that he wanted to raise with Meyers "some things about [the defendant's] mental health and employment histories and . . . the events on May 3."[6]  After a lengthy sidebar conference, the judge ruled that the statements made during Meyers's interviews of the defendant were not admissible on direct examination.  During the remainder of his direct testimony, Meyers testified that the defendant suffered from bipolar disorder.  As a basis for this opinion, Meyers stated that he had relied upon the defendant's "history from different sources and as well my history from him."

The thrust of the prosecutor's cross-examination was that the defendant's prior treatment records did not support a

---

[6] After the conclusion of Meyers's testimony, defense counsel provided the judge with another offer of proof.  Counsel represented that Meyers would have testified to the following: (1) the defendant's relationship with the victim; (2) the events of May 3, 2013, including "that morning when he woke up," "his plans with [his] daughter and communications with his daughter in the afternoon," and "his activities during the afternoon leading up to the time he arrived at [the victim's house]," "the events between 5:30 P.M. and approximately 6:45 P.M. -- that is, in the kitchen and living room area and the event itself"; (3) the defendant's employment history, including losing two potential jobs in late April, 2012, after having lost his truck driving position in March, 2012, that caused "a significant amount of stress, anxiety, and depression; and (4) the defendant's mental health history including instances of manic behavior.

diagnosis of bipolar disorder. Pursuing this line of inquiry, the prosecutor asked Meyers about records admitted in evidence from the Lahey Clinic and Holy Family Hospital, treatment records from the Cambridge house of correction and Bridgewater State Hospital, and a May 7, 2012, competency evaluation conducted by Dr. Jodie Shapiro. The prosecutor did not challenge Meyer's reliance on the defendant's out-of-court statements as the basis for his expert opinion that the defendant suffered from bipolar disorder. On redirect examination, defense counsel did not ask Meyers any questions about statements made by the defendant concerning this subject.

The question the defendant raises concerns the admissibility of testimony by an expert witness, on direct examination, concerning facts upon which the expert's opinion is based, and that are independently admissible, but that have not been introduced in evidence. See generally Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986); Mass. G. Evid. § 703 (2017). Prior to our decision in Department of Youth Servs., we followed the traditional rule that an expert's opinion had to be "based on either the expert's direct personal knowledge, on evidence already in the record or which the parties represent will be presented during the course of the trial, or on a combination of these sources." Commonwealth v. Barbosa, 457 Mass. 773, 784 (2010), cert. denied, 563 U.S. 990

(2011), quoting LaClair v. Silberline Mfg. Co., 379 Mass. 21, 32 (1979). In Department of Youth Servs., supra at 531, we expanded the permissible bases of expert opinion testimony to include "facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion."[7] See Commonwealth v. Chappell, 473 Mass. 191, 203 (2015), quoting Department of Youth Servs., supra; Barbosa, supra at 785.

Although an expert may formulate an opinion based on facts or data not admitted in evidence, but that would be admissible with the proper witness or foundation, "the expert may not testify to the substance or contents of that information on direct examination." Commonwealth v. Chappell, 473 Mass. 191, 203 (2015), quoting Department of Youth Servs., 398 Mass. at 531. The purpose of this limitation on expert witness testimony is to prevent the proponent of the opinion from "import[ing] inadmissible hearsay into the trial." Commonwealth v. Goddard, 476 Mass. 443, 448 (2017). See Commonwealth v. Greineder, 464

---

[7] In Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986), we decided to take a "modest step" toward allowing an expert witness to state his or her basis of opinion, and declined to adopt then proposed Mass. R. Evid. 703 (the equivalent of Fed. R. Evid. § 703). Under this broader evidentiary rule, the proponent of expert opinion testimony is permitted to disclose otherwise inadmissible facts or data to the jury "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. § 703 (2012). See Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 16 (1998).

Mass. 580, 583, cert. denied, 134 S. Ct. 166 (2013) ("Disallowing direct testimony to the hearsay basis of an expert opinion helps prevent the offering party from slipping out-of-court statements not properly in evidence in through the 'back door'"); Commonwealth v. Nardi, 452 Mass. 379, 392 (2008) (expert witness may not "under the guise of stating the reasons for his opinion" testify to inadmissible hearsay).

We have emphasized that "[t]he thrust of [our] rule is to leave inquiry regarding the basis of expert testimony to cross-examination" (citation omitted). Barbosa, supra. The opposing party then may, as a matter of trial strategy, elicit details of the facts or data underlying the expert's opinion. Commonwealth v. Markvart, 437 Mass. 331, 338 (2002). If the door is opened by the opposing party, on redirect examination, the proponent of the evidence then may introduce the details surrounding the source of the expert's opinion.[8] Chappell, 473 Mass. 203-204.

---

[8] For example, on cross-examination in this case, the prosecutor challenged Meyers's assumption that the defendant took his medications as prescribed following his release from the hospital. Meyers agreed that he did not examine the defendant's pill bottles or "have any conversation with anyone else [other than defense counsel] about the number of pills" missing from those bottles. Thereafter, on redirect examination, the judge permitted Meyers to testify to certain information he had obtained from the defendant during the forensic interview. The judge ruled that the testimony was admissible on redirect examination "as a basis of [Meyers's] opinion . . . for the fact that it was said and the doctor relied on it." Meyers then testified that he learned that the defendant felt nauseated and vomited soon after awaking midday

See Mass. G. Evid. § 705 (2017).  See generally Commonwealth v. Garcia, 470 Mass, 24, 36 (2014) (purpose of redirect examination is to "explain or rebut adverse testimony or inferences developed during cross-examination" [citation omitted]).

The judge's decision to require compliance with this rule of evidence did not violate the defendant's constitutional right to present a full defense.  The rule limiting direct examination testimony of an expert witness "is a common-law evidentiary rule that operates in both civil and criminal cases and applies to both sides."[9]  Chappell, 473 Mass. at 204.  "A defendant's right to present a full defense . . . is not without limits . . . and as a general rule, does not entitle him to place before the jury evidence normally inadmissible" (quotations and citations omitted).  Id.  Here, Meyers testified that he interviewed the defendant, and that he diagnosed the defendant with bipolar disorder based in part upon learning the defendant's history.

---

on May 3, 2012, and that this was evidence that the defendant had been compliant with taking his medication as prescribed.

[9] See Commonwealth v. Johnston, 467 Mass. 674, 696 (2014) (error for Commonwealth's expert psychiatrist to summarize  on direct examination statements provided by witnesses that defendant did not exhibit signs of mental illness during weeks and hours before killing); Commonwealth v. Nardi, 452 Mass. 379, 392 (2008) (substitute medical examiner unable to testify to hearsay statements recorded in autopsy report); Commonwealth v. Jaime, 433 Mass. 575, 577-578 (2001) (Commonwealth's expert should have been precluded from testifying on direct examination that witnesses reported that defendant was his normal jovial self day before murder).

The underlying facts, which were not otherwise introduced in evidence, were not admissible on direct examination. See Barbosa, 457 Mass. at 784; Mass. G. Evid. § 703.

The defendant argues that the rule established in Department of Youth Servs. has been called into question by our subsequent decisions in Commonwealth v. Brown, 449 Mass. 747, 768 (2007), and Commonwealth v. Rutkowski, 459 Mass. 794, 799-800 (2011). These cases, however, do not support the proposition that facts not otherwise in evidence are admissible on direct examination of an expert witness. In both cases, we held that where a defendant's statements properly have been admitted in evidence, an instruction that the statements may be considered only as the basis of the expert's opinion is warranted. See Rutkowski, supra; Brown, supra.

Furthermore, we note that the judge's evidentiary ruling did not deprive the defendant of the ability to pursue an insanity defense. The defendant was able to introduce testimony from his and the Commonwealth's medical experts, his medical records from four different facilities, and evidence from his competency examination, as well as statements by his father and his classmates as to his appearance and activities in the first twenty-four hours after he was released from the hospital. See Chappell, 473 Mass. at 204-205 (noting that defendant was able to elicit excluded information by introducing medical records).

The defendant argues that the statements excluded from evidence would have described his conduct on May 3, 2012, and would have demonstrated that he had experienced psychiatric symptoms suggesting that he was suffering from a manic episode as a result of his bipolar disorder. The transcript indicates that, on direct examination, referring to his review of "records" and "collateral material," Myers was able to provide a detailed description of the events of May 3, 2012.

In describing the events on the day of the victim's death, Meyers testified that, on that day, the defendant made plans to take Alexa out for ice cream. He arrived to pick up Alexa at around 5 P.M. and went into the house. At first, the defendant, Alexa, and the victim "were conversing" and "things were fine." The victim ordered takeout food for Alexa, and the defendant and the victim got into an argument. The victim attempted to stab the defendant; he grabbed the knife from her. "At some point she picked up a knife again. They went at it. This time . . . is in front of his daughter."

In addition, Myers testified as to the defendant's mental health history. This history included details involving the defendant's admission to Holy Family Hospital on April 29, 2012, and his subsequent treatment and prescriptions. In Meyers's opinion, the defendant had exhibited symptoms of bipolar disorder prior to the May 3, 2012, incident. Meyers testified

that the defendant had been struggling with depression, anxiety, and irritability for years, "which could be a sign of bipolar"; that the clinicians at the jail documented "the [defendant's] history of prior manic episodes"; Alexa witnessed the defendant's wide fluctuation in moods on May 3, 2012, ranging from "nice and sweet one moment, then screaming, then psycho and then nice again." Meyers also described the defendant's May 7, 2012, competency evaluation, at which Shapiro had noted that "approximately a week before [the evaluation, the defendant] had symptoms of what appeared to be mania. He had described increased hypersexual feelings . . . sleep problems, increased energy and that had just been a week before so it sounded like the beginnings of a manic episode."

b. Admission of Commonwealth's expert witness opinion testimony on defendant's motivation. The defendant argues that Fife, the Commonwealth's expert witness, improperly testified about what "drove" the defendant to kill the victim. He contends that this testimony was impermissible, first, because Fife did not express her opinion in accordance with the standard set forth in Commonwealth v. McHoul, 352 Mass. 544, 546 (1967); and second, because Fife's testimony infringed on the jury's right to determine the ultimate question of the defendant's criminal responsibility. As there was no objection to Fife's testimony, our review is limited to consideration whether there

was error, and if so, whether it created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).

During Fife's testimony, the following exchange took place:

Q.: "Based on your evaluation of the defendant and your review of the associated materials in this case, do you have an opinion to a reasonable degree of medical certainty as to whether mental illness drove this defendant to kill [the victim] on May 3, 2102?"

A.: "Yes, I have an opinion."

Q.: "And what's that opinion?"

A.: "My opinion is that mental disease did not drive this behavior on that day."

Q.: "And, again, based on your evaluation of the defendant and your review of the case materials, do you have an opinion to a reasonable degree of medical certainty as to whether a mental defect drove this defendant to kill [the victim] on May 3rd of 2012?"

A.: "Yes, I have an opinion."

Q.: "And what's your opinion on that?"

A.: "My opinion is that there is no mental defect present at that time that drove his behavior."

Q.: "What in your opinion did drive him to kill her on that day?"

A.: "In my opinion, this individual, the defendant was angry, he was upset, he had feelings of depression, sadness mixed with danger [sic], mixed with rage and I think that those were the primary feelings that drove the behavior on that day."

We conclude that there was no error in Fife's testimony about what drove the defendant's behavior.  A qualified expert

witness need not phrase his or her opinion in terms of the McHoul test. See Commonwealth v. Amaral, 389 Mass. 184, 193 (1983), citing Commonwealth v. Shelley, 381 Mass. 340, 348 n.4 (1980), S.C., 411 Mass. 692 (1992); Commonwealth v. Gerhartsreiter, 82 Mass. 500, 509 (2012). To the contrary, "Testimony in purely medical or psychological terms may in many instances be preferable; the expert may be best equipped to use medical and psychological concepts, and the testimony may not fit neatly in legal categories." Shelley, supra.[10]

---

[10] Defense counsel also questioned Fife on what drove the defendant's behavior, albeit in a hypothetical form.

"Assume that an individual is in the midst of a breakup with his girl friend who has never exhibited any signs of physical violence towards that girl friend suffers from an apparent depressed mood, exhibits suicidal thoughts and behaviors, is hospitalized for three days due to that depressed mood and suicidal behaviors and thoughts, is prescribed Prozac and Trazodone, takes those medications for three or four days, exhibits symptoms of nausea and vomiting, then goes to his girl friend's home with his daughter present with a Chinese food delivery person on the way and then stabs her.

"My question is you as a psychiatrist would it be reasonable to suggest that you would have to explore the possibility that that conduct was driven by a mental disease or defect?

". . .

"Would it be reasonable, Doctor, and would you have to explore the possibility that the Prozac and Trazodone drove that conduct . . . ?"

The defendant argues also that, in another portion of her testimony, Fife misstated the McHoul standard.  Fife stated that she relied on that standard, which she described as follows:

> "[The McHoul standard] states that at the time of the crime -- at the time of the crime -- at the time of the alleged crime, an individual has to first meet the criteria for mental illness, and then it splits from there so that if a person meets that criteria [do] they as a result of the mental illness either lack the substantial capacity to appreciate the wrongfulness, it's sometimes called the criminality, but the wrongfulness of their behavior at the time of the alleged crime as a result of the mental illness, or were they substantially less capable of conforming their behavior to the requirements of the law, again coming back to because of an active mental illness at the time of the crime."

In an attempt to clarify her testimony, Fife strayed from the McHoul formulation and stated:

> "I think of that as the first part of it that whether or not there is a mental illness and then the prongs as if there's a mental illness because of that illness. Sometimes I think of it as but for the illness would the crime have happened.  You know, so . . ."

We have cautioned that if an expert witness were to reference a legal standard, "[C]ounsel properly would be required to ask the expert to cast his opinion in terms of the legal standard set out in McHoul."  Shelley, 381 Mass. at 348 n.4.  Fife did not do that; indeed, her statement was both incorrect and likely to have confused the jury.  Fife's effort to clarify her understanding of the McHoul standard did not, however, create a substantial likelihood of a miscarriage of justice.  The judge interrupted her midsentence to inform the

jurors that she would be the one to instruct the jurors "on the law that they will apply with respect to the standard" before they began deliberating. In her final charge, the judge correctly instructed the jury as follows:

> "Criminal responsibility is a legal term. A person is not criminally responsible for his conduct if he has a mental disease or defect, and as a result of that mental disease or defect lacks substantial capacity either to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of law."

See Gerhartsreiter, 82 Mass. App. Ct. 509-510 (no error where expert witness misstated McHoul standard but judge provided proper legal standard).

Moreover, Fife's testimony concerning what drove the defendant's behavior did not usurp the jury's role as the sole and exclusive finders of the facts. An expert witness may not offer an opinion as to a defendant's guilt or innocence. Goddard, 476 Mass. at 446. Commonwealth v. Lodge, 431 Mass. 461, 467 (2000). An expert witness is not precluded, however, from providing an opinion that reaches or approaches the ultimate issue in a case. See Commonwealth v. Okoro, 471 Mass. 51, 66 (2015), quoting Commonwealth v. Federico, 425 Mass. 844, 847 (1997); Mass. G. Evid. § 704 (2017).

In this case, Fife did not offer an opinion that the defendant was criminally responsible for the victim's death. She was permitted to testify that anger, sadness, and rage, not

mental illness, motivated his actions.  See Commonwealth v. Johnston, 467 Mass. 674, 699-700 (2014) (no error in expert testimony implying that defendant's resentment for victim, not mental illness, motivated killing); Commonwealth v. LaFave, 407 Mass. 927, 934 (1990) (expert allowed to testify on issue of motive).  See also Commonwealth v. Goddard, 476 Mass. at 446-447 (expert testimony that defendant's behavior was "planned" and "goal-directed" was admissible as relevant to issue of criminal responsibility).

c.  Mutina instruction.[11]  In her final charge, the judge instructed the jury on the consequences of a verdict of not guilty by reason of lack of criminal responsibility, as set forth in Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975).  The judge instructed as to "what happens to a defendant if he is found not guilty by reason of lack of criminal responsibility."  At trial, the defendant did not object to this formulation of the instruction.  In this appeal, however, the defendant argues that the instruction created a substantial likelihood of a miscarriage of justice because the judge failed adequately to inform the jury of the real possibility that the defendant could be committed for life.

---

[11] We have considered the additional arguments in the defendant's reply brief filed pursuant to Commonwealth v. Moffett, 383 Mass. 201, 207-208 (1981), and conclude that they are unavailing.

In Chappell, 473 Mass. at 205-206, we modified the model Mutina instruction set forth in our Model Jury Instructions on Homicide, effective at the time of the defendant's trial. The provisional instruction set forth in Chappell, supra at 209 (Appendix), informs the jury that "[t]here is no limit to the number of such renewed orders of commitments as long as the defendant continues to be mentally ill and dangerous; if these conditions do continue, the defendant may remain committed for the duration of his [or her] life." Nonetheless, we concluded also that the Mutina instruction as set forth in the 2013 Model Jury Instructions on Homicide accurately stated the law, and that the judge did not err in giving the then-existing Mutina instruction. Id. at 205-206.

In cases decided after Chappell, we have said that it is not error for a judge "like the judge in Chappell . . . [to give] the Mutina instruction that, at the time of trial, was the governing model jury instruction." Commonwealth v. Dunn, 478 Mass. 125, 139 (2017). See Commonwealth v. Griffin, 475 Mass. 848, 862 (2016). The Mutina instruction the judge gave in this case, three years before we decided Chappell, was proper and did not create a substantial likelihood of a miscarriage of justice.

d. Review pursuant to G. L. c. 278, § 33E. We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and we discern no reason to order a new

trial or to reduce the conviction of murder in the first degree to a lesser degree of guilt.

<u>Judgments affirmed</u>.