NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12872

IN THE MATTER OF J.P.


     Bristol.     April 6, 2020. - October 28, 2020.

   Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                    & Kafker, JJ.[1]


Mental Health.  Practice, Civil, Commitment of mentally ill
     person, Hearsay.  Evidence, Hearsay, Medical record.



     Petition for involuntary commitment filed in the New
Bedford Division of the District Court Department on February
16, 2018.

     The case was heard by Bernadette L. Sabra, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Lois M. Farmer for J.P.
     Richard F. Ready (Heidi A. Kostin also present) for
Southcoast Behavioral Health.
     The following submitted briefs for amici curiae:
     Ruth A. Bourquin, Matthew R. Segal, Jessica J. Lewis, &
Jessie J. Rossman for American Civil Liberties Union Foundation
of Massachusetts, Inc., & another.
     Karen Owen Talley, Committee for Public Counsel Services,
Kathryn Rucker, Coco Holbrook, Jennifer Honig, & Tatum A.
Pritchard for Committee for Public Counsel Services & others.

_____

     [1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

Anna S. Richardson for Veterans Legal Services.
Lester D. Blumberg, Special Assistant Attorney General, for Department of Mental Health.

BUDD, J.  The long-term involuntary civil commitment of persons with mental illness is only permissible if a judge finds proof beyond a reasonable doubt that discharge would create a likelihood of serious harm.  See G. L. c. 123, §§ 7, 8; Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 276 (1978).  Here, after an evidentiary hearing, a District Court judge issued an order to civilly commit J.P. for a period not to exceed six months.  J.P. appealed from the Appellate Division's affirmance of the decision to the Appeals Court, and we transferred the case to this court on our own motion.  We are asked to determine whether sufficient admissible evidence was presented to warrant an order of civil commitment pursuant to G. L. c. 123, §§ 7, 8.  We conclude that the answer is yes.[2]

Background.  1.  Standard for long-term civil commitment. By petitioning the district (or juvenile) court, the superintendent of a mental health facility may seek to commit involuntarily, for a period of between six and twelve months, an

---

[2] We acknowledge the amicus briefs submitted by the American Civil Liberties Union Foundation of Massachusetts, Inc., and the Massachusetts Coalition for the Homeless; by the Committee for Public Counsel Services, Center for Public Representation, Mental Health Legal Advisors Committee, and Disability Law Center; by Veterans Legal Services; and by the Department of Mental Health.

individual who has been admitted to the facility.  G. L. c. 123,
§§ 7 (a), 8 (d).  For an order of commitment to be issued, the
judge must find, after a hearing, that "(1) such person is
mentally ill, and (2) the discharge of such person from a
facility would create a likelihood of serious harm."  G. L.
c. 123, § 8 (a).  Further, the judge must find that there is no
alternative that is less restrictive than hospitalization.
Commonwealth v. Nassar, 380 Mass. 908, 917-918 (1980).

The phrase "likelihood of serious harm" is statutorily
defined as "(1) a substantial risk of physical harm to the
person himself [or herself] as manifested by evidence of,
threats of, or attempts at, suicide or serious bodily harm; (2)
a substantial risk of physical harm to other persons as
manifested by evidence of homicidal or other violent behavior or
evidence that others are placed in reasonable fear of violent
behavior and serious physical harm to them; or (3) a very
substantial risk of physical impairment or injury to the person
himself as manifested by evidence that such person's judgment is
so affected that he is unable to protect himself in the
community and that reasonable provision for his protection is
not available in the community." G. L. c. 123, § 1.  The harm
must be shown to be imminent, that is, it will materialize "in
days or weeks rather than in months."  Matter of G.P., 473 Mass.
112, 128 (2015).  Each of the statutory requirements must be

demonstrated beyond a reasonable doubt.  Id. at 119.  See Nassar, 380 Mass. at 913.

2.  J.P.'s civil commitment hearing.  On February 12, 2018, J.P. was transferred from St. Luke's Hospital (St. Luke's) emergency room to Southcoast Behavioral Health (SBH).  SBH filed a timely petition for J.P.'s involuntary commitment pursuant to G. L. c. 123, §§ 7, 8, after J.P. requested to be discharged. In the petition, SBH alleged that, as a result of mental illness, J.P. presented both a risk of harm to others and a very substantial risk of harm to himself in that he was unable to protect himself in the community.[3]  SBH further alleged that civil commitment was the least restrictive alternative in the circumstances.

At the commitment hearing, J.P.'s treating physician, Ronald Lee, testified that, once at SBH, J.P. was uncooperative in providing information regarding his psychiatric history, although he did indicate that he previously had been hospitalized at other mental health facilities.[4]  J.P. also refused to allow the facility either to release information to,

---

[3] Southcoast Behavioral Health (SBH) did not allege that J.P. was suicidal.

[4] J.P. indicated that he was originally admitted to St. Luke's Hospital (St. Luke's) as a result of a "209," which Dr. Lee interpreted to mean a 209A restraining order.  However, SBH could not confirm that such an order had been issued against J.P., and the judge did not make reference to it in her findings.

or obtain information from, his mother or any other providers involved in his care.

Dr. Lee, who diagnosed J.P. with schizoaffective disorder-bipolar type, found J.P. to be unengaged, uncooperative, and unwilling to participate in treatment. Lee testified that J.P. was one of the most paranoid patients he had ever met as a physician at SBH. J.P. refused medication and often walked out during meetings with the doctor. J.P. also was hostile and aggressive toward the doctor. J.P. referred to Dr. Lee as a "fucking punk" and a "fucking rat," and indicated that he could not work with the doctor because of the doctor's Asian ethnicity. Lee testified that, at one point during a meeting, as J.P. insisted to Lee that he did not have a psychiatric issue, J.P.'s jaw was clenched, his muscles were tensed, and he appeared to be bordering on lashing out. J.P. also warned the doctor that going forward with commitment proceedings would be a mistake. These interactions caused Lee to feel threatened at times.

According to the SBH medical records, J.P. told a different SBH doctor that he was able to "handle himself in a bar," stating, "I know what to do if anybody gets in my face." J.P. further revealed that he was trained in martial arts and "know[s] a few things." He also made threats to a nurse practitioner, telling her that if he did not get his

(nonpsychiatric) medication, "something uncontrollable will happen and you won't like it."

Lee also reported that J.P. also had altercations with his peers during his stay. Two different patients reported to the doctor that J.P. had threatened their lives. In addition, J.P.'s roommate had to be moved out of the room for safety reasons.

The doctor also testified as to the content of the records from St. Luke's that accompanied J.P. when he transferred to SBH.[5] According to those records, J.P. had threatened and exhibited paranoid behavior toward his mother. He accused his mother and neighbors of placing beer in his refrigerator. He also forced his mother to stay up at night to "keep a watch out" for him, telling her, "Don't you come back in the house."

J.P. presented his own expert witness, a doctor who examined J.P. the morning of the hearing. That doctor opined that J.P. suffered from a delusional disorder-paranoid type or paranoid schizophrenia, but disagreed that that J.P. met the criteria for involuntary civil confinement.

At the conclusion of the hearing, the judge found that J.P. suffered from a major mental illness, that discharge from SBH would create a likelihood of serious harm, and that there was no

---

[5] The records themselves were not offered as evidence at the hearing.

less restrictive alternative to involuntary civil commitment. The judge subsequently ordered J.P. civilly committed for a period not to exceed six months.[6]

Discussion.[7]  Here, we review the sufficiency of the evidence presented that, if released, J.P. posed a likelihood of serious harm as defined by the statute.[8]  As discussed supra, a likelihood of serious harm can be proved in one of three ways. SBH presented evidence from which the judge concluded that the facility met the criteria of two of the definitions:  J.P. posed a substantial risk of physical harm to others as well as a very substantial risk to his own safety.[9]

In our review of the sufficiency of the evidence, we accept the findings of fact made by the hearing judge unless clearly erroneous; however, we review without deference whether the

---

[6] J.P. was ordered committed on March 6, 2018.  Although the order of commitment expired on September 4, 2018, he was discharged from SBH on March 26, 2018.

[7] We note that, although J.P. is no longer involuntarily committed to SBH, the matter is not moot.  "[A]n individual has a personal stake in the outcome of litigating an appeal from an order of civil commitment, even after the individual is released."  Matter of a Minor, 484 Mass. 295, 300 (2020).  See Matter of F.C., 479 Mass. 1029, 1029-1030 (2018).

[8] J.P. does not contest the finding of mental illness, nor does he contest the finding that hospitalization was the least restrictive alternative available in the circumstances.

[9] SBH did not present evidence of the first prong, a likelihood of serious harm due to a substantial risk of suicide or other self-harm.

legal standard for civil commitment was met.  See Matter of a Minor, 484 Mass. 295, 302 (2020).

1.  Substantial risk of physical harm to others.  To conclude that a person poses a substantial risk of physical harm to others, a judge must find either "[1] evidence of homicidal or other violent behavior or [2] evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them."  G. L. c. 123, § 1.  With regard to this element, the judge focused on the second of the two alternative predicates, finding a risk of physical harm based on evidence from J.P.'s stay at SBH, and the statements that his mother made that others were placed in reasonable fear of physical harm from him.  The judge also found that J.P.'s judgment was so affected by his paranoia, agitation, and contrariness as to affect substantially the safety of others in the community (as well as his own).

J.P. argues that the evidence of his mother's statements was inadmissible hearsay, and that, without them, there was insufficient evidence of a substantial risk of physical harm to others.

a.  Hearsay evidence.  Statements made by J.P.'s mother were contained in the emergency room records from St. Luke's, about which Lee, the treating physician from SBH, testified at the hearing.  The records were not admitted in evidence.  J.P.

argues that the judge improperly considered this evidence because it was inadmissible hearsay.[10]  We agree.

The mother's statements were hearsay because they were made out of court during a conversation with a social worker and were offered for their truth.  Moreover, the statements were reduced to writing and included in records from which Lee testified.  Thus, Lee's testimony regarding the records containing the mother's statements comprised three levels of hearsay.  In order for this testimony to have been admissible, each of the hearsay statements had to have fallen within one of the exceptions to the hearsay rule.  Commonwealth v. DePina, 476 Mass. 614, 623 (2017).

SBH contends that the testimony regarding the mother's statements was admissible pursuant to G. L. c. 233, § 79, which permits the introduction of medical records as evidence of diagnosis, prognosis, and proximate cause of the condition diagnosed, among other things.  The purpose of the statute is to "admit presumptively reliable evidence without the necessity of calling numerous hospital personnel as witnesses."  Bouchie v. Murray, 376 Mass. 524, 528 (1978).  However, the emergency room records themselves were not admitted in evidence; thus, Lee's testimony regarding anything in those records, including the

---

[10] J.P. raised a timely hearsay objection to the testimony regarding the mother's statements at the hearing.

mother's statements, was hearsay that is not admissible under an exception to the rule.[11]  As this portion of Lee's testimony was inadmissible, we need not go on to examine the admissibility of the mother's hearsay statements within the emergency room records.

However, we conclude that J.P. suffered no prejudice from the admission of this evidence.  Although the judge indicated that she considered the mother's hearsay statements in concluding that J.P. posed a substantial risk of physical harm to other persons, she found that the mother was not the only one who reasonably feared physical harm from J.P.  Because, as discussed infra, the evidence presented was sufficient for a finding of a substantial risk of physical harm without the mother's statements, J.P. was not prejudiced by their admission.  See Commonwealth v. Evans, 439 Mass. 184, 191, cert. denied, 540 U.S. 923 and 540 U.S. 973 (2003) (admission of identification hearsay evidence not prejudicial where cumulative of other properly admitted evidence).

---

[11] Even if Lee took the St. Luke's records into consideration when diagnosing J.P., an expert witness may not testify about evidence that formed the basis of their expert opinion but was not admitted in evidence.  Commonwealth v. Goddard, 476 Mass. 443, 448 (2017), quoting Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010), cert. denied, 563 U.S. 990 (2011) ("experts are prohibited 'during [their] direct examination[s] from informing the jury about the facts or data [they] considered that were not in evidence but that would be admissible with the right witness or proper foundation'").

b.  Sufficiency of the evidence.  At the hearing, Lee testified to his personal experience with J.P. as J.P.'s treating physician, describing in some detail J.P's threats, menacing body language, and verbal abuse leading the doctor to feel threatened.  There also was evidence of J.P.'s intimidating behavior toward others at SBH, including threats to kill two patients.[12]

J.P. contends that the evidence that others were placed in fear was "subjective, speculative or unspecified" and thus it amounted to subjective fear rather than the objective "reasonable fear" required by G. L. c. 123, § 1.  We disagree. A showing of "evidence that others are placed in reasonable fear of violent behavior and serious physical harm" means presenting evidence that, in the circumstances, a reasonable person would fear violent behavior and serious physical harm, and that someone actually did fear violent behavior and serious physical harm.  Unlike the first clause of the second prong, which requires a showing of "homicidal or other violent behavior" from the respondent, the second clause of the second prong requires a showing that those who interact with the respondent fear being subjected to "violent behavior and serious physical harm," and that such fear is reasonable.  G. L. c. 123, § 1.

---

[12] We note that the testimony regarding the patients' statements to Lee was not objected to at the hearing.

Here, from an objective viewpoint, the evidence presented of J.P.'s behavior, including his verbal threats and demeanor, would cause a reasonable person to fear violent behavior and serious physical harm from J.P. Further, there was testimony from Lee of his fear of such an outcome. The judge further inferred that, given the descriptions of J.P.'s interactions with other medical providers and patients, others also feared violent behavior and serious physical harm. Thus, we conclude that there was sufficient evidence (even without the mother's statements) demonstrating beyond a reasonable doubt that others were placed in reasonable fear of imminent violent behavior and serious physical harm to them. See G. L. c. 123, § 1; Matter of G.P., 473 Mass. at 126.

2. Very substantial risk of harm to self in the community. The judge further concluded that there was sufficient evidence that without involuntary commitment, J.P. also posed a very substantial risk of harm to himself in the community because he would not be able to protect or care for himself. See G. L. c. 123, § 1. The evidence supporting this conclusion was not robust, and SBH did not press a sufficiency argument with regard to this prong. Because we have concluded that the evidence presented was sufficient to demonstrate likelihood of serious harm under the second prong, we need not address the sufficiency of the evidence to prove the third prong, including J.P.'s claim

that SBH failed to prove that "reasonable provision for his protection [was] not available in the community." G. L. c. 123, § 1.

However, we take this opportunity to address a footnote in the Appellate Division's decision in which the court expressed the view that "homelessness, in and of itself, presents a very substantial risk of harm to a person [himself]" due to the "risks of theft, abuse, and violence" that the homeless population faces. It is true that homelessness can mean a lack of safety and stability, but that does not mean that homelessness, in and of itself, is sufficient to support a finding of a very substantial risk of harm to the person himself or herself. If it is to be used at all as part of the involuntary civil commitment analysis, it must be done with extreme caution.

Webster's Third New International Dictionary 1083 (1993) defines "homeless" as "having no home or permanent place of residence." It is a broad term that may, but need not, be synonymous with living on the streets and being exposed to the attendant dangers that come with it.[13] But even if a person does not have a place to stay and will be in a homeless shelter or on

---

[13] Here, J.P. testified that although he could not return to live with his mother, he had other options, including staying in a hotel and staying with friends.

the street, that is not proof that he or she will pose a substantial danger to himself or herself.

We further note that people become homeless for many reasons, including, but not limited to, being a domestic abuse survivor, being unemployed or underemployed, and falling on hard times.[14]  Mental illness may, or may not, be a factor.  None of these conditions, including mental illness, necessarily means that the person meets the criteria of the third prong, i.e., that there is, a "very substantial risk of physical impairment or injury to [that] person . . . as manifested by evidence that such person's judgment is so affected that he [or she] is unable to protect himself [or herself] in the community."  G. L. c. 123, § 1.  Thus, although homelessness may be part of the involuntary civil commitment analysis, it alone cannot suffice to demonstrate a likelihood of serious harm to the person himself or herself under G. L. c. 123.

Conclusion.  The judgment of the District Court judge is affirmed.

So ordered.

---

[14] See National Law Center on Homelessness & Poverty, Homelessness in America:  Overview of Data and Causes, at 3 (Jan. 2015) (listing unemployment and low wages as among top causes of homelessness).