NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11426

COMMONWEALTH  vs.  LUIS ORTIZ.


Middlesex.      October 10, 2014. - November 26, 2014.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Firearms.  Practice, Criminal, Capital case.  Self-
    Defense.



Indictments found and returned in the Superior Court
Department on June 24, 2010.

The cases were tried before Richard T. Tucker, J.


Dana Alan Curhan for the defendant.
Jamie Michael Charles, Assistant District Attorney, for the
Commonwealth.


LENK, J.  The defendant appeals from his conviction of

murder in the first degree, on a theory of deliberate

premeditation, in the shooting death of Philip Meltzer.

Although the defendant concedes that the evidence was sufficient

to support the jury's verdict, and does not suggest that any

error occurred at trial, he contends that the verdict was

against the weight of the evidence.  The defendant asks that we exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce his conviction to a lesser degree of guilt. Having reviewed the entire record, we decline to do so, and affirm the defendant's conviction.

Because the defendant maintains that the verdict was against the weight of the evidence, we summarize that evidence without drawing all inferences favorable to the Commonwealth. See Commonwealth v. Franklin, 465 Mass. 895, 896 (2013).

On May 29, 2010, the defendant's sister, Angelie Ortiz,[1] was kidnapped by her former boy friend, Gilberto Cartagena. Cartagena trapped Angelie and their two year old son in a van and drove to the Lowell home of his acquaintance, Timothy Brown. Brown got into the van with Angelie and Cartagena and drove them to Lawrence.  Brown had given Cartagena a gun, and on the way to Lawrence, Cartagena pointed the gun at different parts of Angelie's body, including her genitals, and threatened to kill her.

At some point, Angelie inadvertently dialed her brother's telephone number.  A resulting message on the defendant's telephone's voicemail recorded Angelie crying and screaming for several minutes.

---

[1] Because Angelie Ortiz shares a last name with the defendant, we refer to her by her first name.

In Lawrence, Angelie escaped with her son.  She arranged for the defendant to meet them, and the defendant drove them to Angelie's aunt's home.  Angelie told the defendant that Cartagena had kidnapped her and her son and had threatened her with a gun.

In the early hours of May 30, 2010, the defendant picked up Angelie and their cousin, Luis Fontanez.[2]  Angelie and Fontanez believed that they were driving to New Hampshire.  On the way, Angelie, Fontanez, and the defendant stopped at a wake, where the defendant had a drink.  Angelie told guests at the wake that she had been kidnapped.  She also gave the defendant additional details about her ordeal, including the fact that Cartagena had pointed a gun at her genitals.

After returning to their vehicle, Angelie, Fontanez, and the defendant stopped at a nearby gasoline station, where Angelie pumped gasoline and the defendant went into a convenience store.  His image and that of the clothing he wore, including a striped red shirt, were captured by the store's security camera.  After they left the store, Angelie drove, and the defendant directed her to Brown's neighborhood.  When they passed Brown's house, Angelie pointed it out as the house to which Cartagena had taken her.

---

[2] Both Angelie and Luis Fontanez testified pursuant to grants of immunity.

Angelie, Fontanez, and the defendant circled the block twice. The defendant instructed Angelie to stop the vehicle, saying that he was "going to handle something." At some point, Fontanez had heard the defendant say that Cartagena was "going to get his." Angelie left the engine running; according to her testimony, the defendant had instructed her to do so. Angelie also turned off the headlights. The defendant asked Fontanez to hand him gloves, and he put on one or both of the gloves. Somewhere en route from the gasoline station to Brown's house, the defendant had changed out of his striped red shirt and into a dark T-shirt. The defendant stepped out of the vehicle, went to the trunk, pulled out a gun, and put it in his waistband. He walked towards Brown's house.

Cartagena was not at the house, but Brown was there. The victim, Meltzer, was Brown's roommate, and he was also at the house, along with Megan Grover, the victim's girl friend. Earlier that day, Brown had stolen heroin from Cartagena. Brown, Grover, and the victim were mixing the stolen heroin with cocaine and using both. Cartagena telephoned Grover on one or more occasions, looking for Brown and threatening to kill him.

The defendant knocked on the door to Brown's house sometime after 3 A.M. Brown ran out the back door and into the basement. Grover stood in the doorway of Brown's room. The victim went to open the front door. Grover testified at trial that the victim

was not holding anything in his hands, and that she had never seen him with a weapon. When the door opened, the defendant pulled a gun out of his jeans, shooting himself in the leg in the process. The defendant then shot the victim twice, killing him. The defendant returned to the car, where he told Angelie, "I think I shot myself."[3]

Angelie took the defendant to the hospital. Before entering the hospital, the defendant took off his bloody jeans and his underwear. Angelie then drove to an ice cream shop and delivered the defendant's rolled-up jeans to some friends. The clothing, but not the gun, were later recovered by police.

The defendant instructed Angelie and Fontanez to tell police that he had been shot in front of a nearby liquor store. The defendant himself told police on multiple occasions that he had been shot at that liquor store. During the course of their investigation, officers asked the defendant several times, "If it was self-defense, let us know." The defendant answered, "No, I was never there."

The defendant was charged with murder in the first degree, armed entry and assault with intent to commit a felony, and

---

[3] Fontanez testified at trial that the defendant had said, "I got shot, but I shot him back." In his grand jury testimony, which was introduced at trial as a prior inconsistent statement, Fontanez had said that the defendant "not only said he shot himself, he said he shot someone else."

unlawful possession of a firearm.  At trial, the defendant's theory was self-defense.  He testified that, at the wake, he heard for the first time the voicemail message that recorded his sister screaming.  He decided to confront Cartagena, and he went to Brown's house intending to fight Cartagena, whom he knew well, or Brown, whom he did not know.  The defendant explained that he had taken a gun with him because he knew that Cartagena was a violent man who owned guns of his own.  Indeed, Cartagena had given the defendant the gun that he used that night.  According to the defendant, the victim, whom the defendant also did not know, opened the door, pointed a gun at the defendant, and fired.  The defendant shot his own gun only because he did not believe that he could run away.

At the close of the Commonwealth's evidence, the judge allowed the defendant's motion for a required finding of not guilty on the theory of felony-murder.  The only theory of murder in the first degree on which the judge instructed the jury was deliberate premeditation.  The judge also instructed the jury on murder in the second degree and on voluntary manslaughter based on heat of passion upon reasonable provocation, heat of passion induced by sudden combat, and excessive use of force in self-defense.  In addition, the judge provided a detailed instruction on self-defense.

The jury found the defendant guilty of murder in the first degree and of unlawful possession of a firearm. They acquitted him of the charge of armed entry and assault with intent to commit a felony. The defendant filed a motion for a finding of guilty of murder in the second degree, which the trial judge denied.

The defendant argues on appeal that the verdict was against the weight of the evidence. He contends that considerable evidence suggested that he acted in self-defense. Other evidence, according to the defendant, pointed to mitigating factors, and particularly to mitigation based on heat of passion. Finally, the defendant notes that he had virtually no criminal record before this offense, and that his life has featured meaningful family relationships and professional accomplishments.

General Laws c. 278, § 33E, requires us to determine if a new trial or a reduction of a conviction to a lesser degree of guilt is required because "the verdict was against the law or the weight of the evidence . . . or for any other reason that justice may require." "Regard for the public interest impels us to use with restraint our power under § 33E to modify the jury's verdict." Commonwealth v. Colleran, 452 Mass. 417, 431 (2008), quoting Commonwealth v. Williams, 364 Mass. 145, 151 (1973). We thus have stressed time and again that "[w]e do not sit as a

second jury to pass anew on the question of the defendant's guilt."  Commonwealth v. Carlino, 449 Mass. 71, 80 (2007), quoting Commonwealth v. Leahy, 445 Mass. 481, 501 (2005).  See Commonwealth v. Reddick, 372 Mass. 460, 464 (1977).  In order for this court to "grant a new trial on the ground that the verdict was against the weight of the evidence, it must appear that the verdict, if allowed to stand, would work a miscarriage of justice."  Commonwealth v. Franklin, 465 Mass. 895, 916 (2013), quoting Commonwealth v. Jefferson, 416 Mass. 258, 266 (1993).  See Commonwealth v. Coyne, 420 Mass. 33, 35 (1995). The record in this case does not indicate that the verdict was against the weight of the evidence, or that it otherwise worked a miscarriage of justice.

Turning first to the matter of self-defense, to which the defendant testified, the defendant sought to undermine Grover's contrary testimony that the victim was not holding a gun.  He did so by exploring her history of drug use and by introducing evidence that she could not have seen what she claimed to have observed about the shooting.[4]  Even if the jury were to discount

---

[4] The defendant introduced photographs and other evidence purporting to show that, given the layout of the house, Grover only could have seen the killer's gun, as she claimed, if it had come within an inch or two of the victim.  The evidence indicated that, at so close a range, the killer's shots likely would have left marks known as "stippling" on the victim's body, but that no such stippling was discovered.

aspects of Grover's testimony, they were free to credit her testimony that the victim was unarmed when he answered the door, just as they were free to discredit the defendant's claim that he shot the victim in self-defense.  "The jury could believe all, some, or none of the testimony of any witness." Commonwealth v. Gomes, 459 Mass. 194, 203 (2011), citing Commonwealth v. Harbin, 435 Mass. 654, 658-659 (2002).

There were also multiple factors that supported Grover's account.  Unlike the defendant, Grover had no apparent reason to lie.  A search of Brown's house by police did not turn up the gun that, according to the defendant, the victim had been holding.  And both Angelie and a neighbor testified that they had heard three shots; because the defendant fired two shots at the victim and one, inadvertently, at himself, if the victim had first shot at the defendant, nearby witnesses would have been expected to hear four shots.[5]  In sum, "the question of self-defense was fully aired at the trial," Commonwealth v. Walker, 443 Mass. 213, 229 (2005), and we see no reason to disturb the jury's resolution of this question.

---

[5] Fontanez testified at trial that he had heard four shots. This evidence was impeached with Fontanez's statements to police that he had heard three shots.  Fontanez's grand jury testimony on this subject was ambiguous.  Angelie testified before the grand jury that she had heard "three or four" shots.  Another neighbor heard only two shots, as did Megan Grover.

The jury's conclusion that the defendant's actions were not mitigated by heat of passion was also not against the weight of the evidence. The defendant had learned sometime the previous day that Angelie had been kidnapped. It is possible that the defendant, as he alone testified, first heard Angelie's unintended voicemail message at the wake. But the defendant left the wake, went into a convenience store, returned to his vehicle, traveled to Brown's neighborhood, and twice circled the block before arriving at Brown's house. The defendant also took various measures in apparent preparation for the shooting: he changed from a conspicuous striped shirt into a nondescript dark one; asked his cousin for a glove or two and put them on; took a gun out of the trunk and placed it in his waistband; and left behind a car primed for a speedy, undetected escape, its motor running and its lights off. After leaving the scene, the defendant evidently arranged for the disposal of his gun and bloody clothing, and he concocted a false story to explain his wound, which he instructed his sister and his cousin to tell police. The jury were entitled to conclude, based on this evidence, that the defendant's actions reflected premeditation rather than spontaneity, and that a conviction of murder in the first degree, rather than a lesser offense, was warranted. Cf. Commonwealth v. Colleran, 452 Mass. at 432, citing Commonwealth v. Gaulden, 383 Mass. 543, 556 (1981).

Finally, the personal characteristics to which the defendant points, while relevant to our analysis, are insufficient in this case to disturb the verdict.  See Commonwealth v. Walker, 443 Mass. at 229; Commonwealth v. Almon, 387 Mass. 599, 607-608 (1982).

We have reviewed the entire record pursuant to G. L. c. 278, § 33E.  We are satisfied that the defendant's trial was conducted fairly and without error, and we discern no cause to reduce the defendant's conviction to a lesser degree of guilt or to order a new trial.

Judgments affirmed.