NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-09903

COMMONWEALTH vs. LEON ROBINSON.

Suffolk.     January 5, 2024. - April 12, 2024.

Present: Budd, C.J., Gaziano, Kafker, & Wendlandt, JJ.

Homicide. Practice, Criminal, Motion to suppress, Warrant, Affidavit, Disclosure of evidence, Argument by prosecutor, Assistance of counsel, Instructions to jury, Discovery, Capital case. Search and Seizure, Probable cause, Warrant, Affidavit. Probable Cause. Constitutional Law, Right of defendant in criminal case to act pro se. Evidence, Disclosure of evidence, Argument by prosecutor, Expert opinion, Firearm. Firearms.

Indictments found and returned in the Superior Court Department on April 30, 2001.

A pretrial motion to suppress evidence was heard by Joseph M. Walker, III; the cases were tried before Elizabeth B. Donovan, J.; a motion for a new trial, filed on April 30, 2019, was heard by Debra A. Squires-Lee, J.; and a motion for postconviction discovery, filed on December 14, 2022, was considered by this court.

Elizabeth Caddick for the defendant.
Ian MacLean, Assistant District Attorney (Mark T. Lee, Assistant District Attorney, also present) for the Commonwealth.

KAFKER, J.  Defendant Leon Robinson was convicted of murder in the first degree for the 2001 shooting death of Recardo Robinson[1] (victim).  On the afternoon of February 21, 2001, the defendant and the victim got into an argument at the victim's barbershop, which culminated in the defendant shooting the victim four times in front of several witnesses.  The defendant was arrested that night, and in 2005 was convicted of murder in the first degree on a theory of deliberate premeditation and of unlawful possession of a firearm.

Appealing from his convictions and from the denial of his motion for a new trial, the defendant advances a number of arguments regarding errors committed before and during his trial.  He argues that his motion to suppress evidence obtained from the search of his apartment was erroneously denied.  He also asserts that his right to represent himself at trial was violated, and that the trial prosecutor acted improperly by delaying disclosure of a change in a witness's testimony and by ascribing a motive not supported by the evidence to the defendant during closing arguments.  The defendant next contends that he was denied effective assistance of counsel because his trial counsel did not introduce in evidence a swatch of fabric with a spot of the victim's blood, and because his trial counsel

---

[1] Although the defendant and the victim share a surname, they are not related.

did not retain an expert on eyewitness identification or blood spatter analysis to testify.  Finally, he asserts that the trial judge abused her discretion in choosing not to give the jury instruction requested by defense counsel on the possibility of an honest but mistaken identification by witnesses.  He further argues that the cumulative effect of all the alleged errors requires that we grant him a new trial.  He also requests that we reduce his conviction of murder in the first degree to manslaughter as more consonant with justice.  Separately, he also appeals from the denial of his motion for postconviction discovery, and from his conviction of unlawful possession of a firearm.

Having considered all the arguments advanced by the defendant and having reviewed the entirety of the record pursuant to our duty under G. L. c. 278, § 33E, we affirm the conviction of murder in the first degree.  However, we vacate his conviction of unlawful possession of a firearm and remand for a new trial on that charge.

1.  Factual and procedural background.  We recite the facts as the jury reasonably could have found them, reserving certain facts for our discussion of the legal issues.

The victim was the owner of Hair Textures, a barbershop located in the Brighton section of Boston.  On the afternoon of February 21, 2001, the shop saw many visitors, as the victim was

closing down the shop before moving to North Carolina. Among the visitors that afternoon were Maurice McIntosh, a friend of the victim who had previously worked at Hair Textures, and James Rainey, who was a regular at the shop. The defendant, who was not a regular at the barbershop but was a family friend of the victim, was also present, having received a haircut at the shop earlier in the afternoon. By around 4:20 $\underline{P}$.$\underline{M}$., only four men remained in the barbershop: the defendant, the victim, McIntosh, and Rainey.

The victim began lecturing the defendant about how the defendant needed to "straighten up" and change the way he was living his life in order to take better care of his children. The lecture upset the defendant, and the defendant showed the men in the barbershop that he was carrying a black revolver. The victim looked at his cell phone, and the defendant asked the victim who he was calling. The victim told the defendant he was not calling anyone, and again began lecturing the defendant on how to live his life. The entire conversation between the victim and the defendant lasted about five minutes, at the end of which the defendant pulled out his gun and shot the victim once in the chest. The victim fell, and the defendant shot the victim twice in the back and once in the back of the head. Rainey ran to the back of the barbershop and descended a staircase to the basement, where he hid until he was found by

police.   McIntosh fled out the front door and ran to a nearby pizza shop, where he called 911.

Dorinda Carter was parking her car on Commonwealth Avenue outside Hair Textures at the time of the shooting.   She saw the defendant pull a gun from his waist area and shoot at the victim.   The victim fell, and the defendant shot twice more. The defendant left the barbershop.   Carter drove away, but returned to the area and spoke to police when they arrived at the scene.

Police arrived at the barbershop a few minutes after the shooting.   They secured the scene, discovered Rainey during a protective sweep of the barbershop basement, and identified McIntosh, Rainey, and Carter as witnesses.   Police brought the three witnesses to a police station in Brighton, where officers took statements from each of the witnesses regarding their recollection of what had happened.   McIntosh described the shooter as a Black man with a dark complexion, about five feet, eight inches tall with a "low haircut" and goatee.   He stated that the shooter had worn a black and white Polo brand shirt, a black leather jacket, and a silver chain with a cross.   Rainey told police the shooter was a Black male, five feet, four inches tall, wearing blue jeans and a black leather jacket.   He stated that the shooter was about thirty-nine years old, had short hair, and walked with a limp.   Carter described the shooter as a

darker skinned man of average height with a short, cropped haircut, wearing a brown leather jacket and dark pants. She described the gun as a black revolver.

Based on the witness descriptions of the shooter, police created a set of 106 images of possible suspects. Rainey and McIntosh separately viewed the photographs, and both identified the defendant as the shooter. The defendant's photograph was added to a photographic array with nine other photographs. This array was printed out, and paper versions were shown to Rainey, McIntosh, and Carter. Rainey and McIntosh both identified the defendant as the shooter. Carter circled two pictures to indicate the men who most closely resembled the shooter. One of the pictures Carter circled depicted the defendant.

On the night of the murder, the defendant was arrested at a convenience store near his apartment in the West Roxbury section of Boston. When he was arrested, the defendant was wearing a black leather jacket and dark pants. Later that night, police obtained a search warrant for the defendant's apartment, where they found a black and white Polo brand shirt and a silver chain necklace with a cross.

The defendant's jacket and other evidence was submitted to the Boston police crime laboratory (crime lab). There, criminalists discovered a small stain, roughly two millimeters in diameter, on the right sleeve of the defendant's jacket. The

stained fabric was cut out of the jacket and submitted for testing. The swatch of fabric with the stain tested positive for the presence of blood, and subsequent deoxyribonucleic acid (DNA) testing showed that the bloodstain matched the DNA of the victim.

At trial, the prosecution called McIntosh, Rainey, and Carter, all of whom testified regarding their recollection of the murder. McIntosh and Rainey both identified the defendant as the shooter. Two other witnesses who had been at the barbershop during the afternoon of the murder testified and stated they had seen the defendant there. Criminalists from the crime lab testified that the small stain found on the right sleeve of the defendant's jacket had tested positive for the presence of blood, and that the blood was a DNA match for the victim.

The defendant called Christopher Driscoll, another percipient witness to the murder, who testified that he believed the shooter had been a Black teenager wearing a blue jacket or sweatshirt. Driscoll acknowledged that he only saw the shooter through the window of the barbershop for four or five seconds, and he admitted that his recollection of the shooter's appearance was "pretty foggy."

The defendant also presented evidence that suggested his brother, Michael Robinson,[2] had a motive to kill the victim because of an altercation the night before the murder between the victim and Bobby Stevens, a cousin of the defendant and Michael.  The defense suggested that the eyewitnesses had mistakenly identified the defendant as the shooter instead of Michael because the defendant had been in the barbershop the day of the murder.  Michael testified that he saw the defendant during the afternoon of the murder, and that the two men could have shaken hands when they met.  The defendant posited the theory that when Michael and the defendant shook hands, the victim's blood transferred from Michael onto the sleeve of the defendant's jacket.

The defendant was convicted of murder in the first degree on the theory of deliberate premeditation and was also convicted of unlawful possession of a firearm.  He thereafter filed an appeal.  In the interceding years, the defendant was represented at various times by eight different appellate attorneys.  In 2019, the defendant filed a pro se motion for a new trial.[3]  This

---

[2] As he shares a surname with both the defendant and the victim, we refer to Michael Robinson by his first name.

[3] The pro se motion for a new trial was apparently prepared and served on the Commonwealth in 2016.  However, there is no record of the motion having been received by this court until a copy was submitted in 2019.

motion was supplemented by a brief filed by his eighth and current appellate counsel.  We remanded the motion to the Superior Court where, following a nonevidentiary hearing, it was denied.[4]  The defendant appealed, and that appeal has been consolidated with the defendant's direct appeal from his convictions.

2.  Discussion.  On appeal, the defendant advances a number of arguments regarding errors made by the trial judge, prosecutors, and his trial counsel that he contends weigh in favor of granting him postconviction relief.  We address each in turn.

a.  Motion to suppress.  The defendant presents several arguments as to why the evidence seized from his apartment pursuant to a search warrant should have been suppressed.  "In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (citation and quotation omitted).  Commonwealth v. Tavares, 482 Mass. 694, 699 (2019).

i.  Probable cause.  The defendant first argues that probable cause for the seizure of clothing, shoes, and personal

---

[4] The judge who heard the motion for a new trial was not the trial judge, as the trial judge had retired by the time the defendant's motion was heard.

effects from his apartment was lacking because the nexus between the items sought and place searched was insufficient. The existence of probable cause to issue a search warrant is a conclusion of law we review de novo. See Commonwealth v. Tapia, 463 Mass. 721, 725 (2012). To establish probable cause, the facts of the warrant affidavit and the reasonable inferences that may be drawn from them must contain enough information for an issuing judge to determine that "the police seek items related to criminal activity and that the items described reasonably may be expected to be located in the place to be searched at the time the warrant issues" (citation and quotation omitted). Commonwealth v. Perkins, 478 Mass. 97, 102 (2017).

The affidavit in support of the warrant to search the defendant's apartment provided that officers responded to a shooting incident after an argument at the barbershop and named McIntosh and Lamar Shanks as witnesses. The affidavit further stated that Shanks witnessed an argument in the barbershop between the defendant and victim during the afternoon of the murder but was not present for the shooting. McIntosh witnessed the argument between the defendant and victim as well as the shooting and identified the defendant as the shooter later that day. The warrant listed as items to be seized a black revolver and ammunition, black slacks, a black and white Polo brand shirt, and papers to show proof of residency.

The affidavit stated that witnesses described the defendant as wearing black pants, a black and white long-sleeve Polo brand shirt, and a dark leather jacket.  The defendant was arrested the night of the murder near his home wearing a black leather jacket but not the other clothing described, leading to the reasonable inference that he went to his apartment and changed some of his clothes between the time of the murder and the time of his arrest.  Accordingly, it was reasonable for the judge to conclude that the clothes might be found at the defendant's residence, particularly because the items sought were "durable, of continuing utility to the defendant[], and it was reasonable to expect that they would be kept at home, particularly as they were not inherently incriminating to possess."  Commonwealth v. Alexis, 481 Mass. 91, 103 (2018), quoting Commonwealth v. James, 424 Mass. 770, 778 (1997).  See Commonwealth v. Cavitt, 460 Mass. 617, 627 (2011) (reasonable to infer that defendant's clothing "could provide trace evidence linking the defendant" to violent crime he was purported to have committed).

The defendant contends that a search for the "black revolver and ammunition" suspected to be used in the commission of the crime was not supported by probable cause because a discharged gun is inherently incriminating, and it is unreasonable to believe that an assailant would store such evidence in his home.  Although we have previously suggested

"that a defendant who has fired a handgun in the commission of a murder 'would not keep at home an incriminating handgun which could be readily identified as the murder weapon through ballistics tests,'" we need not resolve this issue in the instant case. Alexis, 481 Mass. at 103, quoting James, 424 Mass. at 778 n.15. But see Commonwealth v. Wilson, 427 Mass. 336, 343-344 (1998) (probable cause existed to search defendant's home for ammunition and his mother's home for ammunition and weapons where he was arrested in his mother's home on day following murder); Commonwealth v. LeBlanc, 373 Mass. 478, 488 (1977) ("police had probable cause to believe that the gun [used to commit murder] would be concealed in the defendant's home, and the search warrant was thus properly issued"). Where only part of a search warrant is valid, the remedy is to sever the part of the warrant that is overbroad or not supported by probable cause. Commonwealth v. Wilkerson, 486 Mass. 159, 168 (2020). See Commonwealth v. Lett, 393 Mass. 141, 145 (1984) ("The partial suppression remedy for a partially invalid warrant, we believe, effects a pragmatic balance between the deterrent effect of suppression and the cost to society of excluding probative evidence"). Because neither a gun nor ammunition was discovered during the search of the residence, and consequently no gun was introduced at trial, the defendant suffered no harm as a result of the warrant's inclusion of these

items.  See Commonwealth v. Snow, 486 Mass. 582, 591 (2021)
("The defendant is not prejudiced by an overbroad warrant if the
Commonwealth does not seek to exploit the lack of particularity
in the warrant").

ii.  Unnamed witnesses.  The defendant next contends that
the search warrant was not supported by probable cause because
the final paragraph of the search warrant affidavit attributes
the description of the defendant's clothing to "witnesses"
without naming the particular witnesses who made such
descriptions.  The defendant's argument essentially asks us to
submit the affidavit to the type of "hypercritical analysis" we
have explicitly disclaimed when reviewing a search warrant
affidavit on appeal.  See Perkins, 478 Mass. at 102 (reviewing
court reads search warrant affidavit "in a commonsense and
realistic manner . . . without overly parsing or severing it").
Although whether witnesses are named is "one factor which may be
weighed in determining the sufficiency of an affidavit"
(citation omitted), Commonwealth v. Atchue, 393 Mass. 343, 347
(1984), the search warrant affidavit names two witnesses, Shanks
and McIntosh, who both saw the defendant on the day of the
murder and spoke with police.  The judge was entitled to make
the reasonable assumption that one or both of the witnesses
named in the affidavit were the witnesses who described the
clothing worn by the defendant.  That the affidavit did not

explicitly name the witnesses in the paragraph describing the clothing thus does not render the affidavit as a whole defective. See id. (sufficiency of affidavit is determined by "a consideration of all its allegations as a whole" [citation omitted]).

iii. Signature. Finally, the defendant claims that the search warrant was defective because it was not signed by the issuing judge. This argument fails because when "there is no dispute that the judge intended to issue the warrant, and the judge signed the officer's affidavit, the failure to sign the warrant is no more than a clerical error" (citation and quotation omitted). Commonwealth v. Pellegrini, 405 Mass. 86, 89, cert. denied, 493 U.S. 975 (1989). Although the judge failed to sign the search warrant itself, she signed the search warrant affidavit, and submitted a sworn affidavit stating that she reviewed the search warrant application, concluded probable cause existed to search the apartment, and had the "unequivocal intention to sign the Search Warrant." The judge's clerical error thus does not provide reason to invalidate the search warrant. Having considered the defendant's arguments, we conclude that the defendant's motion to suppress was properly denied.

b. Right to proceed pro se. In both his direct appeal and his appeal from the denial of his new trial motion, the

defendant contends that he was denied his constitutional right to proceed to trial pro se.  Claiming he unambiguously invoked his right to represent himself at trial, the defendant argues that the denial of this right was structural error and entitles him to a new trial.

The right to conduct one's own defense in a criminal case is guaranteed by both the Massachusetts Constitution and the United States Constitution.  Commonwealth v. Conefrey, 410 Mass. 1, 10-11 (1991), S.C., 420 Mass. 508 (1995).  Assertion of the right to proceed pro se, however, "must be predicated upon an unequivocal waiver of one's right to counsel."  Commonwealth v. Tuitt, 393 Mass. 801, 807 (1985).  See Conefrey, supra at 11 (defendant can proceed pro se if "the election to proceed without counsel is unequivocal; voluntarily and knowingly made; asserted in a timely manner; and not sought for an improper purpose" [citations omitted]).  Accord United States v. Francois, 715 F.3d 21, 30 (1st Cir.), cert. denied, 571 U.S. 992 (2013) (judges "must keep in mind the strong presumption against waiver" of the right to counsel and ensure decision to proceed pro se is knowing and intelligent).

In May 2005, shortly before the defendant's trial was scheduled to begin, two ex parte hearings were held on May 3 and May 10 regarding whether defendant's trial counsel would withdraw from representing the defendant.  Counsel sought to

withdraw following a disagreement between the defendant and his attorneys regarding trial strategy. The defendant wanted to argue at trial that the blood found on his jacket was planted by police, a theory his attorneys had informed him lacked any supporting evidence. By contrast, the defendant's attorneys advocated for presenting the mistaken identification defense that was ultimately pursued at trial. The defendant disliked this strategy because it involved arguing that his brother Michael had killed the victim in retaliation for a fight between the victim and the defendant's cousin, Stevens, the night before the murder.

Throughout both hearings, the defendant was clear that he wanted his attorneys to question witnesses regarding the possibility that the Boston police department had planted blood on his jacket, and that he disagreed with his attorneys' refusal to do so. Despite their disagreement, however, the defendant did not unequivocally express his desire to proceed to trial pro se. Indeed, when asked directly by the trial judge whether he wished to represent himself at trial, the defendant responded, "Your Honor, I understand that it will be a tremendous task, and I'm not as good with the law as it might seems, I'm not. I'm willing to go along with counsel with their theory and not to go pro se on this . . . ." The defendant reiterated that he wanted trial counsel to elicit testimony that the bloodstain found on

his jacket could not have come from blood spatter.  In other words, although the defendant had disagreements with his trial counsel that led them to move to withdraw, at no point in either hearing did the defendant affirmatively state that he wished to proceed to trial pro se.  Furthermore, the trial judge told the defendant that during trial, if the defendant felt it was necessary to again discuss his trial counsel or trial strategy, the judge would allow the defendant to be heard without the jury or the prosecution present.  During the trial, however, the defendant did not avail himself of this opportunity, providing further support for the conclusion that he did not unambiguously request to represent himself.  See Commonwealth v. Means, 454 Mass. 81, 90 (2009), citing Carnley v. Cochran, 369 U.S. 506, 516 (1962) ("Waiver of counsel may not be presumed from a silent record").  We therefore conclude, as the motion judge did, that because the defendant never unequivocally waived his right to be represented by counsel, his right to represent himself was not violated.  See Conefrey, 410 Mass. at 10-11; Tuitt, 393 Mass. at 807.

c.  Alleged prosecutorial misconduct.  i.  Brady claim.  At trial, the prosecution called McIntosh as a witness.  On direct examination, McIntosh stated that while the victim was lecturing the defendant on the afternoon of the murder, the defendant stepped outside of the barbershop "for a minute," at which time

McIntosh told the victim to "let it go" and stop arguing with the defendant.  McIntosh's previous testimony before the grand jury and his recorded statements had not mentioned the defendant leaving the barbershop and returning.[5]  When the defense objected and explained at a sidebar that the change in McIntosh's testimony had not previously been disclosed to the defendant, the prosecutor stated that McIntosh had not provided this information until trial preparation, and that the prosecution had inadvertently failed to provide notice of this new testimony to the defense prior to trial.

The defendant contends that the Commonwealth's failure to disclose the change in McIntosh's testimony prior to trial represents a breach of the prosecution team's duty to disclose exculpatory evidence.  See Mass. R. Crim. P. 14 (a) (1) (C), 378 Mass. 874 (1979) (prosecutors must disclose "any facts of an exculpatory nature" within their "possession, custody, or control").[6]  See also Mass. R. Prof. C. 3.8 (d), as appearing in 473 Mass. 1301 (2016) (prosecutors are required to "make timely disclosure to the defense of all evidence or information known

---

[5] On cross-examination, McIntosh stated that the defendant did not leave the barbershop but did go to the sidewalk outside the barbershop briefly.

[6] We cite to the version of the rule in effect at the time of the defendant's prosecution.  The current version of the rule contains the same language.

to the prosecutor that tends to negate the guilt of the accused or mitigates the offense").  The defendant argues that the delayed disclosure of this information prejudiced his defense because if the Commonwealth had disclosed the new testimony prior to trial, defense counsel would have incorporated the evidence that the defendant left the barbershop into his opening argument to bolster his claim of mistaken identification.

The Commonwealth has a constitutional duty "to disclose in a timely manner material, exculpatory evidence over which it has possession, custody, or control."  Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 177 (2021).  See Brady v. Maryland, 373 U.S. 83, 87 (1963) ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment").  The changed statements came to the attention of the prosecution sometime before trial but were not disclosed to the defense.  The new testimony was exculpatory because it differed in one respect from both McIntosh's testimony before the grand jury and his recorded statement describing the afternoon of the murder, and therefore provided a basis to impeach his testimony.  See Rodriguez-Nieves, supra (evidence is exculpatory where it may impeach prosecution's witness).  The statements thus had the potential to undercut the reliability of McIntosh, a prosecution witness whose identification of the defendant as the shooter was

important to the prosecution's case.  See Commonwealth v. Ellison, 376 Mass. 1, 22 (1978) ("The Brady obligation comprehends evidence which . . . calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness").  The prosecution therefore had a duty to disclose the change in McIntosh's anticipated trial testimony and violated this duty by failing to disclose the new statement prior to trial.  See Rodriguez-Nievez, supra at 177-178 (prosecutors violated their duty to defendant when they failed to disclose change in witness's statement before trial).

Having concluded that the prosecution violated its duty of disclosure regarding McIntosh's changed statement, we must consider whether the failure to disclose the statement prejudiced the defendant.  "In measuring prejudice, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case" (quotations omitted).  Rodriguez-Nieves, 487 Mass. at 179, quoting Commonwealth v. Almeida, 452 Mass. 601, 609-610 (2008).  Because defense counsel had sufficient opportunity to cross-examine McIntosh regarding his newly found recollection of the defendant briefly exiting the barbershop, we conclude that

the defendant suffered no prejudice from the delayed disclosure. We emphasize that the missing information required no special preparation to understand and digest. It also differed from the information disclosed in only one respect, and not one of particular importance. Although defense counsel was not able to highlight the possibility that the defendant stepped outside before the shooting during opening statements, he emphasized the idea that the defendant left the barbershop in his closing argument, and the defendant raises no other argument regarding how he was prejudiced by the delay in disclosure. See Commonwealth v. Santana, 465 Mass. 270, 293-294 (2013) (no prejudice to defendant from delayed disclosure of exculpatory evidence relating to identification where defense counsel was able to cross-examine witness and highlight exculpatory evidence during closing argument and "the other identification evidence against the defendant was extensive"). Cf. Commonwealth v. Correia, 492 Mass. 220, 226 (2023) (defendant was not prejudiced by late disclosure of prosecution's use of defendant's rap lyrics found on Internet where defense counsel was able to elicit testimony from defendant explaining lyrics). Contrast Rodriguez-Nieves, supra at 179-180 (defendant was prejudiced when change in prosecution witness testimony was not disclosed before trial and expert testimony impeaching credibility of changed testimony would likely have mattered to jury).

ii.  Closing arguments.  The defendant also argues that the prosecutor improperly made reference to facts not in evidence during his closing argument to the jury.  In his closing argument, defense counsel argued that the defendant's brother Michael had murdered the victim.  The defense reasoned that the victim had gotten into a physical altercation with Stevens the day before the murder.  The victim had choked Stevens. Following the altercation, Stevens left the barbershop but warned the victim that he was "going to get [his] cousin." Stevens testified that by his cousin, he meant Michael, whom he saw a few minutes after the altercation.  Michael told Stevens to stay away from the barbershop, and that he (Michael) would take care of it.  Stevens went to a friend's apartment, where he told his friend that he had been in a fight with the victim, and that the next day, he or one of his family members would kill the victim.  Stevens's friend felt that the threat was serious enough that he went to the barbershop the day of the murder and warned the victim about what Stevens had said.  There was no evidence introduced at trial showing that Stevens or Michael communicated with the defendant prior to the murder.  Defense counsel argued that it was Michael, not the defendant, who had a motive to kill the victim and suggested that Michael was the real killer.

During the prosecution's closing argument, the prosecutor argued that because both the defendant and Michael were cousins of Stevens, they both would be similarly motivated to kill the victim because of the fight between Stevens and the victim. The defendant objected, but the objection was overruled. When the defendant renewed his objection after the prosecutor's closing argument, the judge said that she would instruct the jury not to speculate on any of the evidence. During her instructions to the jury, the judge emphasized to the jury that closing arguments were not evidence, and twice told the jury not to decide the facts of the case on the basis of speculation. On appeal, the defendant argues that the statements suggesting he had a motive to kill the victim were improper because there was no evidence introduced showing that he had communicated with Stevens or Michael between the altercation involving Stevens and the time of the murder. Because the defendant objected to the statements, we review for prejudicial error. See Commonwealth v. Francis, 450 Mass. 132, 141 (2007), S.C., 477 Mass. 582 (2017).

"Remarks made during closing argument are considered in the context of the entire argument, together with the evidence presented at trial and the judge's instructions to the jury." Commonwealth v. Da Lin Huang, 489 Mass. 162, 180 (2022). A prosecutor may not misstate evidence or refer to facts not in

evidence during closing argument. Commonwealth v. Goddard, 476 Mass. 443, 449 (2017), citing Commonwealth v. Walters, 472 Mass. 680, 703 (2015). A prosecutor's closing argument may, however, "analyze the evidence and suggest what reasonable inferences the jury should draw from that evidence," Goddard, supra, quoting Commonwealth v. Grimshaw, 412 Mass. 505, 509 (1992). Inferences "need not be necessary and inescapable, only reasonable and possible." Goddard, supra, quoting Commonwealth v. Jones, 432 Mass. 623, 628 (2000).

Because the prosecutor's statement regarding the possibility of the defendant sharing a motive with Michael was, in the context of the entire argument and the evidence presented at trial, a reasonable inference, we conclude that there was no error. See Da Lin Huang, 489 Mass. at 180; Goddard, 476 Mass. at 449. The jury heard testimony that around the time of the murder, Michael and the defendant saw each other every day, even though the defendant did not live in the Brighton area. Furthermore, Stevens's statement to the victim that he was "going to get [his] cousin" and his statement to his friend that he or one of his family members was going to kill the victim could logically refer to either Michael or the defendant, as both were his cousins. These facts in evidence, in conjunction, allow the inference that Michael or Stevens communicated with the defendant regarding Stevens's altercation with the victim,

providing the defendant with the same motive as Michael to kill the victim.[7]  Accordingly, we reject the defendant's contention that the prosecutor's closing argument was improper.

d.  <u>Ineffective assistance of counsel</u>.  The defendant advances three theories as to why his trial counsel was ineffective, thus depriving him of a fair trial.  First, he proposes that his trial attorneys were ineffective because they did not enter the bloodstained leather swatch in evidence for the jury to consider, even though the admitted evidence included expert testimony regarding the bloodstain, the leather jacket from which the bloodstained swatch was cut, and a ruler to help the jury understand the size of the two-millimeter bloodstain.  Next, he suggests that his trial counsel was ineffective for not calling an expert witness on eyewitness identification.  Finally, the defendant argues that trial counsel was ineffective

---

[7] We also note that a "prosecutor is entitled to make a fair reply to the defendant's closing argument," <u>Da Lin Huang</u>, 489 Mass. at 180, quoting <u>Commonwealth</u> v. <u>Smith</u>, 404 Mass. 1, 7 (1989).  The defendant argued that because the defendant's cousin had been in a fight with the victim, the defendant's brother but not the defendant himself had a motive to kill the victim in retaliation.  The prosecutor's statement that Michael's familial motive could easily also provide a motive to the defendant was responsive to this argument by defense counsel.  See <u>Da Lin Huang</u>, <u>supra</u>, quoting <u>Commonwealth</u> v. <u>Lewis</u>, 465 Mass. 119, 130 (2013) ("A prosecutor may address a particular point in defense counsel's closing argument as a sham, but he may not characterize the entire defense as such").

in choosing not to call a blood spatter expert to testify regarding the bloodstain found on his jacket.

Because the defendant was convicted of murder in the first degree, we review his claims of ineffective assistance of counsel under the G. L. c. 278, § 33E, standard to determine whether there was a substantial likelihood of a miscarriage of justice. Commonwealth v. Henderson, 486 Mass. 296, 301-302 (2020), citing Commonwealth v. Vargas, 475 Mass. 338, 358 (2016). Under this standard, we first determine whether defense counsel committed an error in the course of trial, and then determine whether that error was likely to have influenced the jury's conclusion. Commonwealth v. Ayala, 481 Mass. 46, 62 (2018), citing Commonwealth v. Holland, 476 Mass. 801, 812 (2017).

Where a claim of error is based on a tactical or strategic decision by trial counsel, rather than an omission or mistake, an attorney's decision is only ineffective if it was "manifestly unreasonable." Henderson, 486 Mass. at 302. Manifestly unreasonable decisions are those "which lawyers of ordinary training and skill in criminal law would not consider competent." Ayala, 481 Mass. at 62, quoting Holland, 476 Mass. at 812. We consider each of the defendant's claims of error in turn.

i.  <u>Leather swatch introduction</u>.  The defendant was arrested wearing a black leather jacket.  Criminalists at the crime lab inspected the jacket and found a small stain, about two millimeters in diameter, on the right sleeve of the jacket.  They cut a swatch of fabric containing the stain from the jacket to perform testing on the stain.  The stain was determined to be human blood, and DNA testing determined that the blood belonged to the victim.  At trial, two criminalists testified regarding the testing done on the stain and the test results.  However, the swatch of fabric with the stain was not entered in evidence, although a ruler was entered in evidence to help the jury understand the size of the two-millimeter stain.  During jury deliberations, the jury asked the judge whether the leather swatch was in evidence, and the judge instructed the jury that the leather swatch was not marked as an exhibit.

In his motion for a new trial and again on direct appeal, the defendant suggests that his trial counsel was ineffective because when they received the question from the jury about the swatch, they did not move to reopen the evidence to enter the swatch as an exhibit.  The defendant contends that he was prejudiced by this failure because if the jury had been able to see the leather swatch firsthand, they would have concluded that the stain was too small to have been the result of blood spatter, which would have bolstered his argument that the

bloodstain was transferred to the defendant's jacket from contact with his brother on the night of the murder.

The parties disagree as to whether the decision not to move to submit the swatch to the jury as an exhibit was a strategic decision by defense counsel at trial or an inadvertent error.[8] We need not reach the issue whether the omission was a tactical decision, however, because even assuming the failure to submit the swatch to the jury as an exhibit was inadvertent, any error was not likely to have influenced the jury's decision. See Ayala, 481 Mass. at 62. Although the bloodstain itself was not introduced in evidence, the jury heard testimony regarding the discovery of the stain, the testing done by the Commonwealth and the results of that testing, and the size of the stain. Moreover, the jacket itself, as well as a ruler, was introduced in evidence, allowing the jury to visualize the size of the two-millimeter stain. Because the bloodstained swatch itself would not have provided the jury with any new information, it is unlikely that the introduction of the swatch as an exhibit would have influenced the jury's decision.[9] See Commonwealth v.

---

[8] Trial counsel stated in an affidavit that he did not ask that the swatch be submitted as an exhibit because he could not "imagine that [he] would put in the government's evidence."

[9] We note that the defendant cites to no authority suggesting that failing to admit evidence that is cumulative of other evidence in the record rendered trial counsel ineffective, and we further note that the defendant provides only conclusory

Britto, 433 Mass. 596, 602 (2001) ("no error" by defense counsel in choosing not to call additional witnesses whose testimony would be "merely cumulative of other testimony").

ii. Expert testimony. "The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions." Commonwealth v. Kirkland, 491 Mass. 339, 349 (2023), quoting Ayala, 481 Mass. at 63. Indeed, the defendant's trial counsel submitted an affidavit averring that the choice not to call an expert witness on eyewitness identification was a strategic choice, reasoning that "calling an expert witness can cut both ways." Accordingly, we evaluate whether trial counsel's decision not to call an expert witness on eyewitness identification was manifestly unreasonable at the time it was made. See Ayala, supra, citing Holland, 476 Mass. at 812.

The defendant argues that the decision not to call an expert on eyewitness identification was manifestly unreasonable because such an expert could have educated the jury regarding bystander misidentification, which might have undercut the testimony of McIntosh and Rainey by suggesting that they mistakenly identified the defendant as the shooter because they had seen him in the barbershop earlier in the day. An expert

---

allegations regarding the prejudice suffered from the swatch not being presented to the jury.

also could have testified that when a witness is in a highly stressful situation or in a situation involving a weapon, their memories of the situation can be distorted. See Commonwealth v. Gomes, 470 Mass. 352, 372-373 (2015), S.C., 478 Mass. 1025 (2018) (scientific research shows that high levels of stress reduce eyewitness's ability to accurately remember events and make identifications).

Having reviewed the entire record, we cannot conclude that the decision not to call an eyewitness identification expert was manifestly unreasonable in this case. See Kirkland, 491 Mass. at 356-357 (trial counsel not ineffective in choosing not call expert witness where "testimony had the potential to be a double-edged sword for the defense, potentially helping the defendant's case on the one hand but hurting it on the other," and where physical evidence unrelated to expert's testimony identified defendant as shooter). As defendant's trial counsel stated in his affidavit, expert witnesses can cut both ways. If called at trial, an eyewitness identification expert likely would have been forced to admit that because Rainey and McIntosh spent thirty minutes and two hours, respectively, in the barbershop with the defendant prior to the shooting, they likely had ample opportunity to observe the defendant in a nonstressful, well-lit environment, bolstering the credibility of their identifications of the defendant. See Commonwealth v.

Franklin, 465 Mass. 895, 910 n.24 (2013) ("Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, [and] how good were lighting conditions . . ." [citation omitted]).

Furthermore, an eyewitness identification expert likely would have suggested that the description of the shooter by defense witness Christopher Driscoll was likely to be unreliable because Driscoll only observed the shooter for four to five seconds in a stressful situation immediately after the shooting. See Gomes, 470 Mass. at 372-373 (discussing negative effects of stress on memory formation). Driscoll testified for the defense at trial and described the shooter as a Black teenager wearing a blue jacket or sweatshirt, although he acknowledged that his recollection of the shooting was "pretty foggy." Driscoll was the percipient witness whose description of the shooter least resembled the defendant, who was in his late thirties at the time of the murder. The defendant's trial counsel could reasonably have concluded that calling an expert who might bolster the credibility of the prosecution's witnesses while undercutting the reliability of Driscoll's testimony would harm the defendant's case at trial. See Kirkland, 491 Mass. at 356-357. The decision not to call an expert in this case was

therefore not one "which lawyers of ordinary training and skill in criminal law would not consider competent." See Ayala, 481 Mass. at 62. The defendant was therefore not denied effective assistance of counsel by trial counsel's decision not to call an expert witness on eyewitness identification. See id.

Similarly, the defendant argues that his trial counsel was ineffective for choosing not to call a blood spatter expert at trial. In support of his motion for a new trial, the defendant submitted an affidavit from a blood spatter expert who opined that "while it is possible, it is unlikely that the blood stain on the sleeve of the jacket" was the result of blood spatter from a gunshot. Trial counsel stated at an ex parte hearing before trial that a blood spatter expert had been retained and could testify that the spot of blood on the jacket was unlikely to have come from blood spatter. Trial counsel did not, however, believe calling the expert was necessary, given the limited testimony the Commonwealth provided regarding blood spatter,[10] and because an expert would not be able to provide an alternate theory for the origin of the bloodstain. Defense

_____

[10] At trial, the prosecution did not provide any evidence suggesting that the bloodstain found on the defendant's jacket was the result of blood spatter. Instead, the prosecution's witnesses discussed the chain of custody of the jacket and discussed the scientific testing that showed the stain was the victim's blood, but they did not offer theories as to how the blood had come to be on the defendant's jacket.

counsel was also able to elicit testimony from a Commonwealth expert regarding the fact that small droplets of blood do not spatter as far as larger droplets, and during closing arguments he emphasized that the two-millimeter stain was unlikely to have resulted from blood spatter because of its small size.  The strategic decision by trial counsel not to call a blood spatter expert was therefore not manifestly unreasonable because, as the motion judge observed, a blood spatter expert would likely have been forced to admit on cross-examination that it was possible, if unlikely, for the bloodstain to have resulted from blood spatter during the shooting, and thus could potentially damage the defendant's case.  See Kirkland, 491 Mass. at 356-357 (decision not to call expert witness not manifestly unreasonable where expert had potential to harm defendant's case).

e.  Jury instructions.  At trial, defense counsel requested a jury instruction stating that, in addition to considering whether a witness identifying a perpetrator testified honestly, the jury should also consider "whether the witness's identification is accurate or instead is an honest mistake."  The trial judge did not so instruct the jury.  Rather, the judge gave the then-current model jury instruction on identification (Rodriguez instruction).  See Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (1979) (Appendix), S.C., 419 Mass. 1006 (1995) (providing jury instruction on identification testimony

that was basis for model instruction used at defendant's trial).[11]  Near the end of the model jury instruction, the judge added, "In analyzing identification testimony you may consider whether or not the witness might simply be mistaken."  On appeal, the defendant contends that the judge's decision to instruct the jury to consider that "a witness might simply be mistaken" rather than instructing the jury as to an "honest but mistaken" identification was an abuse of discretion.

"Fairness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it."  Commonwealth v. Pressley, 390 Mass. 617, 620 (1983).  Providing such an instruction "help[s] to ensure that the jury understand 'the thrust' of the Rodriguez instruction -- i.e., that a witness might simply be mistaken."  Commonwealth v. Pires, 453 Mass. 66, 72 (2009).

In Pires, 453 Mass. at 68-72, we considered jury instructions essentially identical to the jury instructions provided in the present case.  See id. at 69 n.2 (setting out

---

[11] We have since updated the model jury instruction on identification to reflect more recent science on factors that affect the reliability of eyewitness identification.  Gomes, 470 Mass. at 376.  See Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015).  We explicitly "intend[ed] the new instruction to have no retroactive application."  Gomes, supra at 376.  As such, the Rodriguez instruction was proper at the time of trial.

full jury instruction provided on identification).  Like the
trial judge in this case, the judge in Pires gave the Rodriguez
instruction on identification and instructed the jury that "[i]n
analyzing identification testimony, you may consider whether or
not the witness might simply be mistaken."  Id. at 71.  We held
that "[a]lthough this was not the specific language the
defendant had requested, it was sufficient, in the context of
the over-all instruction, to apprise the jury on the possibility
of an 'honest but mistaken' identification."  Id.  As in Pires,
the instruction here conveyed to the jury the possibility of an
honest but mistaken identification, and we therefore discern no
error in the jury instructions offered by the trial judge.  See
id.  See also Commonwealth v. Cruz, 445 Mass. 589, 597 (2005),
quoting Commonwealth v. Daye, 411 Mass. 719, 739 (1992) ("The
judge is not required to grant a particular instruction so long
as the charge, as a whole, adequately covers the issue").

    f.  Motion for postconviction discovery.  In December of
2022, the defendant filed a motion before this court to view the
district attorney for the Suffolk district's trial file.  The
defendant argued that because allegations had been made that the
trial prosecutor in this case withheld exculpatory evidence in
an unrelated proceeding,[12] and because other Brady violations

---

[12] Following an independent investigation undertaken on
behalf of the district attorney for the Suffolk district, the

have been discovered in unrelated cases, he should be allowed to review the district attorney's trial file to uncover any potentially exculpatory evidence.  Because the motion was not related to a motion for a new trial or a previously filed motion for postconviction discovery, we denied the motion.  See Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001) ("Where affidavits filed by the moving party . . . establish a prima facie case for relief, the judge on motion of any party . . . may authorize such discovery as is deemed appropriate . . .").  We also noted that the defendant had failed to establish a prima facie case for relief, as he made no attempt to explain what evidence he was seeking.  See Commonwealth v. Ware, 471 Mass. 85, 94 (2015), quoting Commonwealth v. Daniels, 445 Mass. 392, 407 (2005) (when requesting postconviction discovery, defendant "must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial").

Here, the defendant contends that we erred and should allow his discovery motion.  We decline to do so.  We emphasize that the defendant continues to engage in a "fishing expedition"

---

prosecutor was cleared of any wrongdoing with regard to the other case.  Prosecutor Cleared of Withholding Evidence, Will Rejoin Suffolk DA's Office, Boston Globe, July 6, 2023.

untethered to any specific claims.  See Ware, 471 Mass. at 94;
Daniels, 445 Mass. at 405-407.

g.  Cumulative error.  The defendant also argues that the
cumulative effect of the alleged errors discussed supra require
that he be granted a new trial.  As we have reviewed each of
these alleged errors and have found no prejudice to the
defendant, even when viewed as a whole, there are no grounds on
which to provide the defendant a new trial.  See Commonwealth v.
Niemic, 483 Mass. 571, 596 (2019) (for defendant to be entitled
to new trial, errors must be such that "we cannot be certain
that the jury would have been able to look at the evidence
clearly and reach a decision based only on proof beyond a
reasonable doubt").

We also reject the defendant's argument that we should
exercise our authority under G. L. c. 278, § 33E, to reduce his
conviction of murder in the first degree to manslaughter.  "[W]e
do not sit as a second jury to pass anew on the question of the
defendant's guilt."  Commonwealth v. Ortiz, 470 Mass. 163, 167
(2014), quoting Commonwealth v. Carlino, 449 Mass. 71, 80
(2007).  Moreover, "[r]egard for the public interest impels us
to use with restraint our power under § 33E to modify the jury's
verdict," Ortiz, supra at 166-167, quoting Commonwealth v.
Colleran, 452 Mass. 417, 431 (2008).  Here, the defendant's
argument that the verdict is not consonant with justice is

unsupported. We therefore decline the defendant's invitation to reduce his conviction to manslaughter.

h. <u>Firearm charge</u>. The defendant also appeals from his conviction of unlawful possession of a firearm. At the time the defendant was convicted, licensure was considered an affirmative defense to a charge of unlawful possession of a firearm. See <u>Commonwealth</u> v. <u>Guardado</u>, 491 Mass. 666, 689 (<u>Guardado I</u>), <u>S.C.</u>, 493 Mass. 1 (2023) (<u>Guardado II</u>). Following the United States Supreme Court's decision in <u>New York State Rifle & Pistol Ass'n</u> v. <u>Bruen</u>, 597 U.S. 1 (2022), however, we held "that absence of licensure is an essential element" of firearm possession offenses. <u>Guardado I</u>, <u>supra</u> at 690. "Because <u>Bruen</u> was decided after the defendant's trial but while the case was pending on appeal, he is entitled to the benefit of the new rule; that is, the right to have the Commonwealth prove that he lacked a license." <u>Guardado II</u>, <u>supra</u> at 12. We therefore vacate the defendant's conviction of unlawful possession of a firearm and remand for a new trial on that charge. See <u>id</u>.

i. <u>Moffett briefing</u>. The defendant filed a 248-page pro se brief along with the brief written by his appellate counsel. The defendant's pro se brief advances thirty-three different arguments, some duplicative of arguments included in the brief filed by counsel and discussed <u>supra</u>. The Commonwealth urges that we should strike the defendant's pro se brief and disregard

the arguments contained therein because the defendant's pro se arguments were not included in defense counsel's appellate brief, pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981).

As we are required to conduct a plenary review of the record to determine whether a meritorious claim existed, pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the defendant's pro se brief despite its numerous nonconformities, which we will not belabor here.  Having reviewed the entirety of the record, including all the additional issues raised by the defendant in his pro se brief, we conclude that nothing contained therein warrants an award of extraordinary relief.  We also conclude that none of these issues merits further discussion.

3.  Conclusion.  For the reasons discussed, the defendant's conviction of murder in the first degree on a theory of deliberate premeditation is affirmed, as is the denial of his motion for a new trial.  Additionally, we affirm the denial of the defendant's motion for postconviction discovery.  We vacate the defendant's conviction of unlawful possession of a firearm and remand for a new trial on that indictment.

So ordered.